*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

      *v.*

PAMELA HOLDER,

                *Defendant-Appellant.*

No. 09-6400

————————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 08-00143-002—Aleta Arthur Trauger, District Judge.

Argued: April 27, 2011

Decided and Filed: September 12, 2011

Before: COLE and STRANCH, Circuit Judges; ZATKOFF, District Judge.[*]

————————————

## COUNSEL

**ARGUED:** Michael C. Holley, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Daniel Steven Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Michael C. Holley, Ronald C. Small, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Daniel Steven Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Peter A. Frandsen, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

————————————

## OPINION

————————————

ZATKOFF, District Judge. On April 13, 2009, Defendant Pam Holder was convicted by a jury of two counts of bank fraud under 18 U.S.C. § 1344 and two counts

_____

[*]The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

of wire fraud under 18 U.S.C. § 1343 in the United States District Court for the Middle District of Tennessee.  Holder appeals the district court's denial of her motion for new trial, arguing (1) prosecutorial misconduct under *Brady v. Maryland*, 373 U.S. 83 (1963), and (2) ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).  For the reasons that follow, we **AFFIRM** the district court's denial of Holder's motion for a new trial.

## I.  BACKGROUND

In June 2008, the Government charged Fred Holder and his wife, Pamela Holder ("Holder"), with two counts of bank fraud and two counts of wire fraud.  In August 2008, the Government dismissed the charges against Fred Holder due to his death, however, the Government maintained its charges against Holder.  The Government's charges against Holder involved her conduct in falsifying or assisting in falsifying certain documents to obtain several loans, in conjunction with Fred Holder, to acquire a home purchased for $1.4 million, intending to resell the home for a profit.[1]  The purchase of the home involved recruiting a third-party with good financial credit, Brenda Leeper ("Leeper").  With Leeper's good credit score, the Holders told her that she could make $1,000 or more per month by assisting the Holders with purchasing and selling homes.  Leeper was intended to be the nominal purchaser of the home.  The fraudulent scheme further included Team Fat Man, Inc., a corporation Fred Holder (a closing manager at a car dealership in Tennessee) organized to manage his own team of car salespersons at the dealership in Nashville, Tennessee.

In an effort to make Leeper appear eligible for three loans, totaling $1.8 million,[2] the Holders provided Leeper with a check for $30,000 that she deposited in her personal

---

[1]The home had been appraised at values ranging from $1.8 million to $2.2 million, and was originally on the market for approximately $2.4 million.

[2]Countrywide Home Loans loaned $1.125 million to Leeper, taking a senior lien position on the purchased home.  The Bank of Nashville loaned $500,000 to Leeper, taking a junior lien position to Countrywide Home Loans.  One month later, the home was refinanced.  At this time, First Tennessee Bank loaned $800,000 to Leeper, of which approximately $500,000 was used to pay the Bank of Nashville loan in full.  The remainder of the $800,000 passed through Leeper to the Holders.  Ultimately, First Tennessee Bank paid the balance on Countrywide Home Loans' $1.125 million loan.  As such, First Tennessee Bank became the sole lien holder, with mortgage receivables totaling $1.8 million on the home.

bank account,[3] and falsified documents so that Leeper appeared as the president of Team Fat Man, Inc. since July 2003, earning a salary of $30,000-to-$40,000 per month.[4] In May 2005, at the closing on the home, Leeper signed mortgage documents to purchase the home at a price of about $1.4 million. Within months, the loan went into default.[5] The First Tennessee Bank foreclosed on the home and eventually resold it, resulting in a net loss of $376,070.16.

## A. PRIOR TO TRIAL

Although the Government charged Holder, the Government never charged Leeper for her involvement in the fraudulent scheme. As trial approached, Peter Frandsen, the lead prosecutor, notified Ronald Small, Holder's defense counsel, that he had promised not to prosecute Leeper for her involvement in the scheme. On February 12, 2009, the Government requested a jury instruction addressing the fact that Leeper would testify pursuant to a guarantee that she would not be prosecuted. The requested instruction stated in relevant part:

> (1) You have heard the testimony of Brenda Leeper. You have also heard that the government has promised that she will not be prosecuted.

Notwithstanding the requested instruction and communication to defense counsel, the Government never communicated to Leeper that she would receive any protection against future prosecution in exchange for her testimony at trial.[6] The Government also did not notify defense counsel, despite its earlier communication with defense counsel,

---

[3]A business affiliate of Fred Holder paid Leeper $30,000 by check under the impression that Leeper needed that amount of liquid assets to appear eligible for a real estate loan. After several months, Fred Holder repaid the outstanding balance.

[4]Although Leeper had a good credit score, she only owned a $100,000 home with a $59,000 mortgage, and earned $10-to-$11 per hour.

[5]The Holders moved into the home and were supposed to make the monthly mortgage payments. After five or six months, the Holders were unable to make the monthly payments in full and Leeper's earning potential was insufficient to make the payments.

[6]Rather, Leeper testified at trial without any knowledge of a nonprosecution agreement.

that Leeper would be testifying without a nonprosecution agreement or withdraw its requested instruction before trial.[7]

## B. AT TRIAL

In April 2009, at trial, the Government had to prove that (a) some of Holder's actions contributed to the fraud, and (b) she acted with the intent to defraud. In his opening statement, defense counsel stated that he would impeach Leeper by proving she was testifying pursuant to a promise against future prosecution:

> you are going to hear [that Leeper] got *a promise not to be prosecuted by the United States Government sitting at this table right here.* You get to decide what the basis or motive is for people to come into this courtroom and testify that something happened.
>     In fact, they talk about this testimony from [Leeper] about being Fred Holder's sister; again, balance her credibility as to against *that statement that she is getting a free pass in this case.* She signed multi-million dollar documents.

R93 at 34-35 (emphasis added).

Besides presenting several witnesses and documentary proofs, the Government called Leeper to testify to the jury. Leeper testified to the jury regarding Holder's involvement in the fraudulent scheme. Following up with defense counsel's opening statements, when Leeper took the stand, defense counsel questioned Leeper on whether she was testifying for the Government in exchange for a promise to not be prosecuted:

> Q. At any time were you promised that you would not be prosecuted for your involvement in this case?
> A. Never.
>
> Q. No one promised you that?
> A. No one said anything like that.
>
>                             * * *
>
> Q. So nobody has come up to you and said you are going to be charged with a federal offense?

---

[7]The jury did not receive the proposed instruction at trial.

A.  No one has.

* * *

Q.  So you were not told by any agent or prosecutor that you could have been charged with offenses?
A.  No, sir, I don't even know what wire fraud is.

Q.  Yes, ma'am.  And you've met with Mr. Frandsen before, have you not?
A.  Yes.

Q.  Did Mr. Frandsen ever make any representations that he would not prosecute you?
A.  Absolutely not.

Q.  Did Ms. Hill ever say to you at any time that you wouldn't be prosecuted for any of your involvement?
A.  No.  No, because I'm innocent.

Defense counsel next questioned the case agent, FBI Agent Lowanda Hill ("Hill"), about the purported nonprosecution agreement.  Hill denied its existence.  On cross-examination, Hill testified that the decision not to prosecute Leeper was made by the U.S. Attorney's Office, not by her.  Defense counsel then asked Hill whether she was present when the decision not to prosecute Leeper was communicated to Leeper.  Hill responded that she could not remember.  At this point, the Court interrupted defense counsel's questioning to take a recess.

## C.  THE DISTRICT COURT'S INTERVENTION AT TRIAL

While in recess, the district court told the parties that defense counsel's examination of Hill regarding a nonprosecution agreement was confusing.  The district court ascertained by questioning the prosecutor that, although the prosecutor had previously decided to promise not to prosecute Leeper, in fact the prosecutor did not offer Leeper such a promise for her testimony at trial.

Before the jury returned, defense counsel further explained to the Court that "[t]he whole reason for me bringing Ms. Leeper back [to question her about the

purported nonprosecution agreement] was because I was under the impression for quite a while that she was given a pass. I was told that and I know Mr. Frandsen corresponded with me about it." The prosecutor confirmed that he had written a letter to defense counsel before trial expressing that Leeper would not be prosecuted.[8] To resolve the irrelevant questioning of Leeper and Hill about the purported nonprosecution agreement, defense counsel moved to withdraw his questions and strike the answers. The district court advised defense counsel that rather than bring the jury's attention to such questioning, the court's standard instruction "that whether or not anybody else is prosecuted in this case is of no moment" would resolve defense counsel's questioning. Defense counsel agreed. On April 13, 2009, the jury returned a verdict finding Holder guilty of two counts of bank fraud in violation of 18 U.S.C. § 1344 and two counts of wire fraud in violation of 18 U.S.C. § 1343.[9]

## D. DISTRICT COURT'S DENIAL OF HOLDER'S MOTION

On May 22, 2009, Holder filed a motion for judgment of acquittal or new trial, raising a claim of prosecutorial misconduct. Holder argued that the prosecutor never informed defense counsel, contrary to the prosecutor's representations to defense counsel, that Leeper was testifying without being offered a nonprosecution agreement, and that the prosecutor had a duty to stop defense counsel from highlighting a nonprosecution agreement that never existed.

The district court addressed the motion at the start of Holder's sentencing hearing on November 13, 2009. The district court recognized that there was a "stark disagreement" between the lawyers as to whether the prosecutor discussed granting "immunity" to Leeper with the defense counsel, and recognized that the actual word "'immunity' was not used in the proposed jury instruction." The district court stated: "I think what happened here is that it was communicated to [defense counsel] that

---

[8]The purported letter is not in the record before the Court.

[9]Holder was sentenced to concurrent prison terms of one year and one day on each of the four counts, three years of supervised release, and ordered to pay $376,070.16 in restitution to First Tennessee Bank. Her prison terms were stayed until the outcome of this appeal.

[Leeper] was not going to be prosecuted." The district court, however, concluded, "I cannot find that the actual word 'immunity' was used by the prosecutor." The district court determined that in the context of the trial as a whole, the alleged error was not devastating.

In support of that conclusion, the district court told defense counsel: "You did not promise something you didn't deliver. What you promised in your opening statement was Brenda Leeper has gotten a pass. And, in fact, Brenda Leeper did get a pass." In denying the motion, the district court held that defense counsel's promise in his opening statement and his questioning of Leeper and Hill were not as important to the jury as defense counsel perceived in hindsight. Ultimately, the district court calculated the Guidelines range to be 30 to 37 months, imposed a sentence of one year and one day for each count, to be served concurrently, and ordered Holder to remain on bond pending the outcome of this appeal. On November 24, 2009, the district court entered its judgment. Holder filed her notice of appeal the same day. Although she appeals from her judgment of conviction, she raises no issue with her sentence or her motion for judgment of acquittal. Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction. Thus, the issues before this Court are Holder's (a) prosecutorial misconduct claim and (b) ineffective-assistance-of-counsel claim.

## II. ANALYSIS

### A.     PROSECUTORIAL MISCONDUCT

Initially, we consider whether the prosecution's failure to disclose information about a nonprosecution agreement violated Holder's constitutional rights. Holder argues that the prosecutor had an obligation to inform defense counsel that Leeper was not granted immunity, and that the prosecutor's suppression of such evidence renders her trial fundamentally unfair under the due process clause of the Fifth and Fourteenth Amendments, which this Court reviews under *Brady*. *See Bell v. Bell*, 512 F.3d 223, 233-34 (6th Cir. 2008) (en banc) (reviewing a defendant's claim that the government should have disclosed to the defense counsel notes of an interview with a witness that

indicated that the witness expected early parole in exchange for the testimony given at trial under *Brady*); *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999) (reviewing a defendant's claim that the government failed to disclose favorable evidence to the defense counsel under *Brady*).  The district court's determination as to the existence of a *Brady* violation is reviewed de novo, *United States v. Miller*, 161 F.3d 977, 987 (6th Cir. 1998), but the district court's denial of Holder's motion for new trial is reviewed under an abuse of discretion standard.  *United States v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005).  "'A district court abuses its discretion when it applies an incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact.'"  *United States v. Pugh*, 405 F.3d 390, 397 (6th Cir. 2005) (citation omitted).

With respect to finding a violation under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is *material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[10]  *Brady*, 373 U.S. at 87 (emphasis added).  For Holder to assert a successful claim under *Brady*, she must show three essential elements: (1) the evidence is favorable to her; (2) the evidence was suppressed by the Government; and (3) the suppression caused her prejudice.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

We proceed directly to the issue of prejudice.  To demonstrate prejudice, Holder must show the evidence at issue is "*material*."  *Strickler*, 527 U.S. at 282.  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citations omitted); *see Bagley*, 473 U.S. at 682; *United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994).  Generally, evidence that could impeach

---

[10]Even though the record does not show whether Holder's defense counsel requested any information regarding the nonprosecution agreement from the prosecutor, in *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court eliminated the requirement that the accused had to make a request and reiterated its prior holding that the government has a duty to volunteer exculpatory evidence regardless of whether it was requested.  *Id.* at 682; *see United States v. Agurs*, 427 U.S. 97, 108 (1976) (finding a duty on the part of the government to volunteer exculpatory evidence).

the credibility of a witness is "material." *Schledwitz*, 169 F.3d at 1011. As such, a written agreement, or a less formal unwritten agreement, between the prosecutor and a witness is impeachment evidence that typically is "material" under *Brady*. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Bell*, 512 F.3d at 233.

In arguing that Holder's trial was prejudiced and that a reasonable probability exists that the jury would have reached a different outcome, Holder asserts that she was prejudiced by the prosecutor's suppression of information about whether a nonprosecution agreement was communicated to Leeper in two ways. First, defense counsel—misled by the prosecutor's proposed jury instruction and statements—promised in his opening statement that he would impeach Leeper with proof of a nonprosecution agreement, but defense counsel broke this promise to the jury because there was no such agreement. Holder asserts this harmed defense counsel's credibility with the jury. Second, defense counsel's questioning of Leeper and Hill regarding the nonprosecution agreement bolstered Leeper's testimony, which Holder asserts was the most important witness to prove her intent to defraud (*i.e.*, an element that the Government had to prove to establish Holder's guilt).

Holder relies on *Anderson v. Butler*, 858 F.2d 16 (1st Cir. 1988), and *Harris v. Reed*, 894 F.2d 871 (7th Cir. 1990). In *Anderson*, the defense counsel promised to the jury that he would call two expert witnesses—a psychiatrist and a psychologist. 858 F.2d at 17. The experts would have testified that the defendant was like a robot, acting without any appreciation of what was happening and without any feeling, during the alleged murder. *Id.* The testimony of the two experts would have likely negated the defendant's state of mind, meaning that he would not be found guilty of murder in the first degree. *Id.* at 18-19. The defense counsel, however, never called the experts, and the jury returned a verdict of murder in the first degree. *Id.* at 17. The court held that the lack of providing such "powerful evidence" was prejudicial as a matter of law. *Id.* at 19. Due to the defense counsel's ineffective assistance, the court reversed the district court's judgment. *Id.*

Further, in *Harris*, defense counsel promised in his opening statements that two witnesses would testify to seeing a person different than the defendant fleeing from the scene.  894 F.2d at 873-74, 878.  From this testimony, the defense counsel told the jury that they would have a basis for finding the defendant innocent.  *Id.*  Because the defense counsel believed the prosecutor's evidence introduced at trial was weak, he never called the two witnesses.  *Id.* at 878.  The court held that the omission of the witnesses was prejudicial because the "jury likely concluded that counsel could not live up [to] the claims made in the opening."  *Id.* at 879.  In finding prejudice, the court reversed the district court's denial of the defendant's writ of habeas corpus, and remanded the case to the district court with directions to grant the defendant's writ of habeas corpus and retry the defendant.  *Id.*

To the extent that *Brady* applies to the issue before us, Holder fails to show that the evidence is "material," meaning that, even if it had been disclosed to defense counsel, a reasonable probability exists that the jury would have reached a different outcome.  *Kyles*, 514 U.S. at 433.  Defense counsel's opening statements only mischaracterized the reason why Leeper was not being prosecuted, which ultimately went to Leeper's credibility, but had no bearing on whether Leeper's testimony would have been heard by the jury.  Holder argues that the cross-examination bolstered Leeper's testimony, but she never asserts that the testimony from Leeper would have been inadmissible or not presented to the jury had the alleged favorable evidence been disclosed.  In this regard, the jury would have heard Leeper's testimony about Holder's involvement in the fraudulent scheme anyway.  To the extent that Leeper's testimony was bolstered and defense counsel's credibility was weakened, the district court also instructed the jury "that whether anyone else should be prosecuted and convicted for these crimes is not a proper matter . . . to consider."  R97 at 102, 115.

With respect to Holder's cited legal authority, she fails to show that defense counsel's promise that Leeper was testifying pursuant to a nonprosecution agreement is similar to the promises made by the defense attorneys in *Anderson* and *Harris*.  Neither *Anderson* nor *Harris* involved promises to the jury regarding the credibility of a

testifying witness, and the alleged favorable evidence in this case is not the type of "powerful evidence" the court found in *Anderson*.

Moreover, in assessing the significance of the evidence withheld, we note that the prosecutor did not rely solely on Leeper's testimony to prove that Holder had the requisite intent to defraud. The prosecutor also introduced other witnesses and documentary evidence to the jury from which they could infer Holder's intent. The jury heard Michael Thayer, a loan broker who submitted loan applications with several banks for the Holders and Leeper. He testified that during the loan application and closing process, he communicated by e-mail and fax with Holder concerning the loan applications, which contained the false information. The prosecutor also presented a quitclaim deed signed by Leeper and dated July 1, 2005, which transferred the home from Leeper to Holder for the sum of one dollar. Further, attorney Norman Rollins testified that in early 2005, Holder visited his office and asked him to prepare new corporate minutes for Team Fat Man, Inc. The new corporate minutes, signed by Holder, expressed that Leeper was the new president of the company, which was false.[11] Rollins also drafted a generic letter that accompanied the new corporate minutes, stating that Leeper was the president of Team Fat Man, Inc. The Rollins letter and new corporate minutes were important because, as Thayer testified before the jury, he relied on them in preparing the loan applications since the two documents supported Leeper's fraudulent monthly income of $30,000.

The jury also heard Selesa Beeler, First Tennessee Bank mortgage lender, who testified that Leeper's purported tax statements, which verified her fraudulent income of $30,000 per month, were faxed by Holder. Beeler further stated that Holder did not correct Fred Holder when he introduced Leeper as his sister at the closing of the home, and that the excess cash from the loans was disbursed through cashier's checks obtained by Leeper, which included a cashier's check payable to Holder in the amount of $50,000. Therefore, given the other evidence presented to the jury, we find no reasonable

---

[11]The falsified corporate minutes indicate that a joint special meeting occurred, in which Leeper was appointed to serve as president of Team Fat Man, Inc. The minutes are signed by Fred Holder, in his capacity as a director and a shareholder, and Holder, in her capacity as a director.

probability that the prosecutor's failure to inform defense counsel that Leeper was not testifying pursuant to a nonprosecution agreement places Holder's case in such a different light as to undermine confidence in the jury verdict. *Kyles*, 514 U.S. at 435, 453.[12] Finding that there is no *Brady* violation, we conclude that the district court properly denied Holder's motion for judgment of acquittal or new trial. The district court did not err when it determined that any confusion caused by defense counsel's opening statements and questioning of Leeper and Hill about a nonprosecution agreement to the jury had a minor effect, if any, on the jury's guilty verdicts.

Our holding, however, should not be construed as suggesting that we condone the prosecutor's lack of candor with the defense counsel. The prosecutor's demeanor was unprofessional and lacked the impartiality we expect of a United States prosecuting attorney. In our view, the prosecutor should have been more forthright with defense counsel when it was apparent during the defense counsel's opening statements, and certainly during the defense counsel's cross-examination of Leeper and Hill, that he was acting in reliance on a purported nonprosecution agreement. We note such misconduct is certainly of the type to warrant review by Tennessee's United States Attorney's Office. Notwithstanding the prosecutor's lack of candor with defense counsel, we find that the district court did not abuse its discretion in denying Holder's motion for judgment of acquittal or new trial.

**B.    INEFFECTIVE ASSISTANCE OF COUNSEL**

We now consider Holder's ineffective-assistance-of-counsel claim. On direct appeal, if the record is sufficient, this Court reviews the merits of an ineffective-assistance-of-counsel claim. *United States v. Johnson*, 581 F.3d 320, 328 (6th Cir. 2009). This Court makes its own review of the record and any factual findings made by the district court. *See United States v. Jones*, 489 F.3d 243, 255 (6th Cir. 2007). An ineffective-assistance-of-counsel claim consists of two components. First, Holder must prove counsel performed deficiently. *Strickland*, 466 U.S. at 686-87. Counsel's

---

[12]Even though she had not received a promise against future prosecution, as the district court concluded, she did receive a free pass, which defense counsel highlighted to the jury.

deficient performance may be caused by the Government when it "interferes" in a defense counsel's ability to make "independent decisions about how to conduct the defense." *Id.* Second, Holder must prove that the deficient performance so prejudiced her defense as to render her trial unfair and the result unreliable. *Id.* To demonstrate prejudice, Holder must show that counsel's alleged errors were so serious that, but for those errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* The defendant must satisfy both components to succeed under *Strickland*, but this Court may review them in the order it deems appropriate. *Id.* at 698.

Holder asserts similar arguments in her claim for ineffective assistance of counsel as she asserts under *Brady*. In reviewing her ineffective-assistance-of-counsel claim, the standard is the functional equivalent to the standard for reviewing Holder's claim under *Brady*.[13] Like her arguments under *Brady*, Holder asserts that defense counsel's unfulfilled promise to the jury and his questioning of Leeper and Hill regarding the nonprosecution agreement prejudiced Holder, and that the outcome would have been different if the prosecutor had not misled defense counsel. However, in subsection II.A, *supra*, we have already reviewed the record and determined that Holder is unable to show that a reasonable probability exists that a different outcome would have resulted had the prosecutor disclosed to defense counsel that a nonprosecution agreement did not exist. Therefore, for the same reasons, Holder is unable to show that defense counsel's alleged errors caused her prejudice. Accordingly, Holder's claim for ineffective-assistance-of-counsel is denied.

---

[13]Under *Strickland,* to find prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In comparison, under *Brady,* evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (citations omitted).

## III.  CONCLUSION

For the reasons above, we AFFIRM the district court's denial of Holder's Motion for Judgment of Acquittal or a New Trial and DENY Holder's ineffective-assistance-of-counsel claim.