**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 12a1012n.06

**No. 11-5221**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Sep 14, 2012*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES of AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| THOMAS SCHROEDER, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE:  GUY and DONALD, Circuit Judges; and O'MEARA, District Judge.[*]

**JOHN C. O'MEARA, District Judge.**  In this matter, Defendant-Appellant, Thomas Schroeder ("Schroeder" or "Defendant"), appeals his conviction March 29, 2012 for conspiracy to impede and impair the Internal Revenue Service ("IRS"), in violation of 18 U.S.C. § 371. Defendant's conviction stems from his involvement in the National Center for Public Education and Prevention ("NCPEp") and with Dr. Robert Felner ("Felner"), his co-conspirator.  Schroeder was the executive director of NCPEp, which was designed to be an Illinois non-profit corporation providing examinations and surveys for school systems around the country.  Felner was a dean at the University of Louisville, who was employed by NCPEp and helped organize its creation.

On February 2, 2010, Defendant was charged with mail fraud (Count 1), conspiracy to launder money (Count 2), and conspiracy to impair or impede the IRS (Count 3). Felner was also charged with these crimes, and several other counts.  Felner pled guilty, but Defendant chose to

---

[*] The Honorable John C. O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

proceed to trial. After a three-week jury trial, Defendant was convicted of conspiring to impair or impede the IRS, but acquitted on the other charges. He was sentenced to 46 months imprisonment.

Defendant challenges his conviction and sentencing on four grounds. First, he claims that there was insufficient evidence from which a jury could convict him of conspiring to impede the IRS. Next, Defendant contends that the prosecution constructively amended Count 3 of the indictment by putting forth evidence that Defendant overstated his expenses on his personal income tax returns when the indictment charged him with failing to report income he received from NCPEp. Defendant also argues that the district court erred in refusing his proposed theory-of-defense instruction regarding good faith. Finally, Defendant claims that his sentence should be vacated because the IRS agent who testified improperly calculated his tax loss. He also argues the district court erred by improperly attributing Felner's tax loss to him. Additionally, Defendant alleges his sentence was disproportionately harsh considering how much more culpable Felner was and how much more Felner benefitted from the scheme. For the following reasons, we AFFIRM.

## FACTUAL BACKGROUND

In this case, Defendant was convicted of conspiracy to impair/impede the IRS after a jury trial that lasted over three weeks. He was friends with his co-conspirator, Felner, who worked at the University of Louisville ("UofL") as a dean of education. While formerly working for the University of Rhode Island ("URI"), Felner helped run URI's National Center for Public Education and Social Policy ("NCPE"). NCPE used software that Felner created to survey school districts, evaluate their performance, and suggest changes. NCPE contracted with school districts in Atlanta, Buffalo, and Santa Monica to survey and evaluate their schools.

2

The government alleged that Felner and Defendant set up NCPEp in 2001 to defraud those school districts, as well as UofL and the Rock Island County Council on Addictions ("RICCA"), to launder money, and to impair and impede the IRS. Basically, while NCPE did work for the school districts, Felner sent invoices to them directing that payment for the work NCPE was doing be made out to Felner/NCPEp. Defendant was the executive director of RICCA, an agency offering prevention assistance for people with alcohol or drug addictions through outpatient treatment and a residential program, as well as the executive director of NCPEp. Additionally, Defendant was a research assistant for Felner, and was paid $25,000 a year by UofL. Defendant held a similar position with URI when Felner was a professor and dean there.

Although Felner played a major role in NCPEp, the entity was created by Defendant, an accountant, John Timmer ("Timmer"), and an attorney, Timothy Feeney ("Feeney"). NCPEp was incorporated in Illinois, and Feeney was its lawyer and registered agent. Felner acted as a coordinator for NCPEp, and from a practical standpoint was most familiar with NCPEp's purported purpose, which was to offer testing and evaluation services to schools throughout the country. NCPEp was supposed to be a non-profit corporation, and steps were taken to obtain status as a 501(c)(3) company, but ultimately those filings were never completed. At its onset, NCPEp applied for an employer identification number ("EIN"), and approved an executive-director compensation package of $3,000 a month for Defendant.

The government's investigation of NCPEp uncovered three bank accounts that were affiliated with the corporation. First, Feeney and Defendant set up an American Bank and Trust account in Rock Island, Illinois (the "AB&T account") on July 17, 2001. Defendant was one of two signatories on the AB&T account and had control of the account. In 2002, a second account at Citizens Bank

3

in Rhode Island (the "Citizens account") was opened with a $250,000 check from the AB&T account. In February 2004, Felner opened a third business bank account in the name of NCPEp at Branch Banking and Trust (the "BB&T account") in Louisville, Kentucky. In order to open this account, Felner falsely stated that he was an officer of NCPEp and listed his home phone number and address in Louisville for the account.

The IRS's lead criminal investigator in this case, Special Agent Robert Masterson ("Agent Masterson") testified that between 2001 and 2008, $2,250,097 was deposited into the three NCPEp accounts. $1,053,097 was deposited into the AB&T account, $169,000 in the Citizens account, and $1,028,000 in the BB&T account. Agent Masterson determined that $1,706,972 came from money various school districts thought they were paying for work being performed by NCPE at URI. $450,000 was from work Felner told UofL he was doing on behalf of a No Child Left Behind grant the university had received, and $93,125 came from RICCA. From his investigation, Agent Masterson found no evidence that NCPEp did any work, or that the accounts were used for anything other than taking in checks and redistributing the money, aside from approximately $15,000 that could have possibly gone towards business expenses such as paying Feeney and Timmer for professional services, bank fees, and corporate filing fees.

Agent Masterson also tracked how the money was distributed from the NCPEp accounts. The vast majority of the funds, over $2,000,000 worth, went to Felner. Specifically, checks worth $517,823 were made out directly to Felner. Another $1,349,985 went to other parties for Felner's benefit. These payments were typically associated with properties Felner owned or purchased. Close to $60,000 went to other individuals that did no work for NCPEp. For example, Diana Laferriere, the business manager of NCPE in Rhode Island, received $1,000 a month for 23 months

4

for doing absolutely nothing. She was told she was on NCPEp's board, but never did anything in conjunction with the position. She once asked Felner why she was receiving this monthly payment, and he simply told her not to worry about it, and that she had earned it. Finally, she asked Felner to stop sending her the money, and she stopped receiving checks.

Defendant himself was paid $282,853 by NCPEp, with almost all of these payments coming from the AB&T account which he controlled. The majority of these payments were "executive director fees" for $3,000 a month. The rest were stylized as reimbursements for various expenses like hotels, per diems, and milage. Another $14,082 went to pay off Defendant's American Express credit card debt. This amount was noted by Agent Masterson because those payments went to pay off charges Defendant incurred for expenses like travel, hotels, per diems, and milage. Defendant, however, also claimed these expenses as deductions on his personal income tax returns.

Much of the evidence presented at trial revolved around NCPEp's failure to properly fill out various IRS forms, in particular Form 1099s ("1099s"). Employers are required to fill out W-2s that note how much money is paid to each employee in a given year. The employer must send the IRS copies of the W-2s and must also give employees a copy for their own records and filings. 1099s are like W-2s except that an employer will fill them out for non-employees that receive income from the employer. Independent contractors are the most common example of someone who would receive a 1099. A Form 1096 ("1096") is a summary of all the 1099s an employer gives out in a given year that also must be filed with the IRS.

NCPEp failed to properly file several 1099s. The most glaring omissions surrounded Felner. NCPEp issued Felner a 1099 for 2001, the first year the entity existed. After he received the 1099 for 2001, however, Felner called Defendant, Timmer, and Feeney and demanded that they stop

sending him 1099s. After 2001, Felner never received a 1099 for income he received from NCPEp until 2007, when he requested one be made out for a specific amount of income that was far less than the amount the government alleged he received that year.

Aside from failing to issue Felner 1099s properly, IRS agents testified that NCPEp almost never filed any corporate tax records with the IRS. In 2001, NCPEp filled out a 1096 and some 1099s, but they were not filed with the IRS. In 2002, some forms were filed with the IRS. Other than those instances, the IRS had no record of NCPEp filing any tax returns. For example, the IRS had no record that NCPEp ever filed a Form 990, which is the return for organizations that are exempt from paying income tax, or a Form 1120, which is the corporate income tax return. As executive director, it was Defendant's responsibility to make sure NCPEp's taxes were properly filed. Over the years, Defendant never seemed to have a problem overseeing RICCA's tax returns, including its 990s.

There were also issues surrounding the 1099s RICCA filled out for work Felner/NCPEp allegedly performed on its behalf over the years. From 2004 to 2008, Defendant, who was the executive director of RICCA, signed invoices for monthly payments to Felner/NCPEp for consulting services. RICCA's bookkeeper testified that, unlike most checks that she sent out on behalf of RICCA, she never mailed these to Felner or to NCPEp's offices.[1] She always simply handed them to Defendant, who told her that he would deliver them to Felner. Timmer's accounting firm, which also was RICCA's CPA, sent a letter to Defendant asking him to clarify whether certain checks were made out to Felner individually or NCPEp. There was confusion because it would often be ambiguous who the checks were actually made out to because the payee would be Robert D. Felner,

---

[1] It should be noted that NCPEp did not maintain any separate offices or permanent location.

Ph.D. – National Center on Public Education and Prevention, Inc. If they were made out to Felner, he should have received his own 1099, with his social security number on it, as opposed to NCPEp's EIN. There was evidence presented that RICCA issued 1099s to NCPEp for income that should have been attributed to Felner personally.

In 2006, NCPEp was involuntarily dissolved by the State of Illinois for failure to file annual reports. Timmer's firm also resigned from doing work for NCPEp in 2006, although it continued to provide accounting services to RICCA. Timmer stated that he believed NCPEp was dormant after 2006 because Defendant informed him that it had been taken over by Felner and the University of Louisville, and that it was out of Defendant's hands.

## PROCEDURAL HISTORY

Both Felner and Defendant were charged with several criminal counts. Felner pled guilty to fraud, conspiracy to launder money, tax evasion, conspiracy to impair or impede the IRS and other charges. Defendant was charged with conspiracy to defraud, launder money, and impair/impede the IRS. He was acquitted of the first two charges and found guilty of the third. Defendant moved for judgment of acquittal or, in the alternative, for a new trial. The district court denied Defendant's motion.

At the sentencing hearing, Defendant objected to the Presentence Report's tax-loss figure, which included the tax loss attributable to Felner. The district court found that Felner's tax loss was reasonably foreseeable to Defendant in light of their conspiracy to impair or impede the IRS. As a result, the court determined that Defendant was accountable for a tax loss of between $400,000 and $1,000,000. After adding two levels for the complexity of the conspiracy, the court determined that Defendant's total offense level was 22. When combined with Defendant's criminal history category

7

of I, Defendant's guideline range was 41-51 months. The district court sentenced Defendant to 46 months imprisonment.

**DISCUSSION**

Defendant makes four arguments on appeal. First, he claims that there was insufficient evidence from which a jury could find that he and Felner agreed to impede the IRS beyond a reasonable doubt. Defendant next contends that the prosecution constructively amended Count 3 of the indictment by putting forth evidence that Defendant overstated his expenses on his personal income tax returns when the indictment charged him with failing to report income he received from NCPEp. Defendant also argues that the district court erred when it refused to submit his proposed jury instruction regarding good faith. Finally, Defendant claims that his sentence is unreasonable because the IRS agent who testified as to what Defendant's tax loss was improperly calculated it. He argues that his sentence is unreasonable because it improperly attributes Felner's tax loss to him and was disproportionately harsh considering Felner was only sentenced to 63 months in prison. For the following reasons, we AFFIRM.

## I.    Sufficiency of the Evidence

Defendant's first argument is that the evidence failed to establish that he engaged in a conspiracy to impair or impede the IRS beyond a reasonable doubt. In reviewing a challenge to the sufficiency of the evidence to support a criminal conviction, we must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). When making this determination, all inferences must be made in favor of the jury's verdict. *See United States v. Cecil*, 615 F.3d 678, 691 (6th Cir. 2010) ("The standard of review for a sufficiency of the evidence challenge is whether, after viewing the evidence in the

light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (internal citations and quotation marks omitted).

Defendant argues that the government did not prove any express or implied agreement between himself and Felner to impede the IRS and that, at best, it established that Defendant mistakenly overstated expenses on his personal income taxes. Because there was more than enough evidence from which a reasonable juror could find that Defendant was guilty of conspiring to impair or impede the IRS beyond a reasonable doubt, we affirm Defendant's conviction.

The main issue is whether the government put forth evidence that Defendant and Felner conspired to use NCPEp to conceal income from the IRS. To establish a conspiracy, the government must prove that there was an agreement between two or more persons to act together to commit a crime, and at least one overt act by either conspirator in furtherance of the conspiracy. *United States v. Milligan*, 17 F.3d 177, 182 (6th Cir. 1994). "Proof of a formal agreement is unnecessary, because acts done with a common purpose can establish an implicit agreement." *Id.* at 182-83; *see also United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004). Not every member of the conspiracy must be an active participant in each phase or every aspect of the conspiracy. *Beverly*, 369 F.3d at 532; *Milligan*, 17 F.3d at 183 ("A defendant may be guilty of conspiracy despite possessing limited knowledge of the conspiracy's scope, details and membership."). "A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id.* (quoting *United States v. Barger*, 931 F.2d 359, 369 (6th Cir. 1991)) (quotation marks omitted); *see also United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997).

The most pertinent evidence that Felner and Defendant agreed to use NCPEp to avoid paying taxes was the improper handling of Felner's 1099s. Felner seemed to be able to dictate whether he

9

received 1099s from NCPEp or RICCA whether he earned income from them or not. Felner received a 1099 from NCPEp for the year 2001. After he received it, however, he called Defendant and Timmer and told them not to send him 1099s any more. Timmer testified that Felner was upset that he had received a 1099 from NCPEp because he claimed that he did not receive all of the money stated in the form and that most of it went to pay for supplies, other expenses, and to different people. Timmer informed Felner that the amount was correct, and that he needed to report the amount of money he received as gross income. On his tax forms he could then list and deduct any expenses he incurred so that he would only be taxed on his net gain. After speaking with both Felner and Defendant, the 2001 1099 was not altered. That, however, was the last time that Felner received a 1099 from NCPEp until he requested one for 2007. Timmer testified:

> In the subsequent years, 2002 and I believe 2003, when we were preparing 1099s, there was some question as to what amount should be on Dr. Felner's 1099, specifically, I believe for the 2002. We were — we were told to go ahead and process the 1099s for — for Tom Schroeder, for some other individuals that worked — or were paid by the NCPEp, but to hold off on completing Felner's until it was resolved and it would be filed later.

Defendant was the one who told Timmer to handle the 1099s that way, and ultimately, Felner's situation was never resolved. Subsequent 1099s should have been filed for the income Felner received from NCPEp, but ultimately they never were. When asked why they were not, Timmer testified: "We were instructed to go ahead and complete the 1099s that we did complete. We made note that we still needed to complete them for Felner and Patsenaude. We were waiting for additional information and instruction to do so and never received it." Timmer stated that his firm asked Defendant for the information and/or further instructions.

10

In addition to not filling out 1099s for Felner, Timmer testified that after 2003, no 1099s were sent out from NCPEp to anybody. When asked if he had a problem or concern about how the company was operated after 2003 and 2004 going forward, Timmer responded, "I certainly had concerns relative to payments to Felner, the 1099 reporting, and not being able to complete the charitable application. We knew that that had not been complete. We knew the tax returns hadn't been filed. There were gaps there."

Felner was not issued a 1099 from NCPEp until 2007, when he specifically asked for one indicating that he made $36,450 that year from NCPEp. Agent Masterson testified that number inaccurately stated how much money Felner received from NCPEp that year. In 2007, Felner received $450,000 from payments NCPEp received from UofL for the No Child Left Behind Grant. Agent Masterson explained that Defendant was aware that Felner received this money from UofL, on behalf of NCPEp, because UofL sent at least one check for $200,000 to NCPEp in Illinois instead of directly to Felner like Felner had instructed UofL. Defendant told Agent Masterson that, per Felner's instructions, he forwarded the check to Felner in Kentucky. At least one other check from UofL that ultimately ended up getting deposited in the BB&T account, passed through Defendant's hands. Agent Masterson said he knew Defendant had the checks at one point because "Mr. Feeney said that, and Mr. Schroeder said that, and I found in AMEX records the shipment information to the University of Louisville."

There was also evidence that Felner and Defendant did not properly record income they received for work NCPEp was purportedly doing for RICCA. Linda Bergendahl, RICCA's bookkeeper, testified that Defendant signed invoices for monthly payments to Felner/NCPEp from 2004 to 2008 for consulting services. She said that unlike most checks she sent out on behalf of

11

RICCA, she never mailed them to Felner or NCPEp's offices. She always gave them to Defendant, who told her he would deliver them to Felner. Bergendahl was surprised to learn that Defendant had been depositing those checks into the AB&T account in Rock Island that Defendant controlled under NCPEp's name.

Felner received compensation from RICCA for his work as a non-employee consultant.As a result, he was supposed to receive a 1099 form from RICCA. Several checks RICCA wrote were unclear whether the recipient was Felner or NCPEp. Timmer's firm sent a fax to Defendant asking him to clarify some records regarding payments RICCA made to NCPEp/Felner. Specifically, the fax asked:

> On the schedule provided for 1099s, you listed National Center on Public Education & Prevention, Inc. as the recipient of funds in the amount of $6,250. It appears that these payments were actually made out to Robert D. Felner, PhD. It appears that we would need to reflect this under Social Security Number. Please advise in writing how to proceed.

The payment should have been recorded under Felner's SSN, as opposed to NCPEp's EIN in order to ensure that he would be accountable for tax purposes.

Finally, Timmer also testified that he never filed or prepared any corporate tax returns for NCPEp. This struck Timmer as unusual. An IRS data-analyst, Paul Crowley, also testified that the IRS had no record of NCPEp filing any tax returns. Except for the year 2002, NCPEp never filed any 1099s or W-2s. In 2002, NCPEp indicated that it paid Diana LaFerriere $6,000 in nonemployee compensation, Felner nonemployee compensation of $105,000 with royalties of $97,000, Defendant nonemployee compensation of $24,000, and Feeney's firm $3,000 for the year 2001. Crowley testified that when corporations fail to file 1099s, 1096s, and W-2s, it makes it much more difficult for the IRS to assess and collect taxes.

12

From the testimony outlined above, there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Defendant and Felner conspired to impair or impede the IRS. Indeed, at the sentencing hearing, Defendant's attorney seemed to concede this issue. While arguing that the government had failed to prove Defendant obstructed justice, and, therefore, that Defendant's sentence should not be enhanced on that basis, defense counsel stated "[y]es, they have presented enough evidence to a jury to convict for a conspiracy with Felner on that — on that impeding or obstructing IRS, but . . . I don't see an actual false statement having been proven to be made. I just don't." Accordingly, Defendant's conviction for conspiring to impair or impede the IRS should be affirmed.

## II.   Constructive Amendment

Defendant also argues that the district court erroneously allowed the prosecution to constructively amend Count 3 of the superceding indictment by permitting evidence that Defendant over-reported expenses on his personal income tax returns. Defendant contends that by focusing on the overstated expenses, the prosecution abandoned the actual indicted Overt Acts, which alleged that he "failed to report gross income received from NCPEp."

Essentially, Defendant claims that the evidence presented at trial represented a variance from the indicted charge to such a degree that it, in effect, amended Count 3. This Circuit has explained that a variance constitutes a constructive amendment

> when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.

13

*United States v. Barrow*, 118 F.3d 482, 488 (6th Cir. 1997) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986)). "The defendant bears the burden of proving the existence of a variance and that such variance affected his substantial rights or rose to the level of a constructive amendment of the indictment." *United States v. Searan*, 259 F.3d 434, 446 (6th Cir. 2001). Substantial rights are only affected when the defendant demonstrates "prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *Id.* (quoting *Hathaway*, 798 F.2d at 911) (quotation marks omitted). Reversal is not warranted where the indictment "fully and fairly informed the defendant of the charges he had to answer at trial." *Id.*

The district court denied Defendant's motion to acquit, or alternatively, for a new trial due to this alleged constructive amendment. The court found that evidence demonstrating Defendant claimed un-reimbursed expenses that had been reimbursed by RICCA or NCPEp "also supports the theory that [Defendant] concealed income." Although this statement suggests that the district court did not view the disputed testimony as a variance, the district court also held that Defendant's allegations, even if true, were not prejudicial. For example, the court stated that the testimony regarding Defendant's income-tax discrepancies was not the only evidence proving Count 3. Finally, the court held that

> There was more than sufficient evidence upon which the jury could find the existence of the charged agreement between Felner and Schroeder, Schroeder's knowing and voluntary participation in that agreement, and the commission by a conspirator of a charged over act in furtherance of the agreement. The contention that a portion of the United States' proof constituted a variance in Count 3 requiring a new trial is without merit.

14

We review whether an indictment was constructively amended *de novo*. *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007). We review the district court's decision not to grant a new trial for abuse of discretion. *United States. v. Holder*, 657 F.3d 322, 328 (6th Cir. 2011). "A district court abuses its discretion when it applies an incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *Id.* (quoting *United States v. Pugh*, 405 F.3d 390, 397 (6th Cir. 2005)) (quotation marks omitted).

To begin with, we agree with the district court's assessment that the evidence demonstrating Defendant overstated his expenses with respect to NCPEp "also supports the theory that [Defendant] concealed income." As a result, a strong argument can be made that such evidence did not constitute a variance from the essential charge of Count 3, which was that Defendant and Felner "did knowingly combine, conspire, confederate, and agree with one another, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful functions of the [IRS] in the ascertainment, computation, and assessment and collection of federal income taxes." Obviously, by misrepresenting his gross income, Defendant impaired the IRS's ability to compute and collect the total amount of income tax he owed. Although it is true that the indictment alleged that the "object of the conspiracy" was to conceal income through NCPEp, and that technically Defendant did not conceal income by overstating his expenses, we find that the evidence is still probative of Defendant's use of NCPEp as an entity to avoid paying income tax.

Even if we were to conclude that the disputed evidence constituted a variance from the indictment, the district court should still be affirmed. As noted above, the critical inquiry is whether the variance "so modif[ied] essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the

15

indictment." *Barrow*, 118 F.3d at 488 (quoting *Hathaway*, 798 F.2d at 910). Because the variance Defendant alleges did not modify the elements of this charge, and there was clearly no confusion regarding the crime Defendant was charged with and had to defend, the district court should be affirmed.

Although the superceding indictment did not explicitly articulate the elements of Count 3, the jury instructions did. The instructions stated that as to the first element "from July 2001 to and including July 2008, Thomas Schroeder and Robert Felner agreed to defraud the Internal Revenue Service by dishonest means[.]" The second element required the jury to find that Defendant "knowingly and voluntarily joined in that agreement;" and the instructions as to the third element required the jury to find "a member of the conspiracy did one of the overt acts described in the superseding indictment for the purpose of advancing or helping the conspiracy."

Evidence that Defendant overstated his expenses (as opposed to under reported his income) does not impact any of those elements. The only element the alleged variance might have affected is the third element, but only if evidence of the over reported expenses was the only overt act the government established at trial. However, the government demonstrated many of the overt acts listed in the indictment, including that Defendant set up NCPEp, applied for an EIN, established the various NCPEp accounts, and provided Felner with a 1099 for 2007 stating that he earned substantially less from NCPEp that year than he actually did. Furthermore, the alleged variance did not cause a risk that Defendant was convicted of a different crime, and did not deprive him notice or a full and fair opportunity to defend himself. *See Searan*, 259 F.3d at 446. Accordingly, we find that the government did not constructively amend Count 3, and affirm the district court's denial of Defendant's motion to acquit or for a new trial.

16

**III.    Jury Instructions**

Defendant claims that the district court erred by failing to issue his proposed jury instruction, which explained that Defendant's good-faith reliance on the professional advice of Timmer and Feeney was a complete defense to the charges against him. We review a district court's choice of instructions for abuse of discretion. *United States v. Tarwater*, 308 F.3d 494, 510 (6th Cir. 2002). We look at the instructions as a whole when deciding whether the district court fairly and adequately submitted the issues and law to the jury. *Id.* "Generally, a defendant is entitled to an instruction on defense theories that are supported by law and raised by the evidence presented." *Id.* (citing *United States v. Duncan*, 850 F.2d 1104, 1118 (6th Cir. 1988)). This Court will only reverse a district court's decision not to give a requested instruction if (1) the instruction is a correct statement of law; (2) it is not substantially covered by other instructions the jury receives; and (3) the fact that the requested instruction is not presented to the jury impairs the defendant's theory of the case. *Id.*

In the past, this Court has found that the lack of a specific instruction regarding a good-faith defense was substantially covered by other instructions. *See, e.g.*, *Tarwater*, 308 F.3d at 510. In *Tarwater*, we assumed that the defendant had presented evidence to support his good-faith defense, but held that the district court's jury instructions, when viewed as a whole, adequately encompassed this defense. *Id.* The instruction actually given in that case stated:

> The word "willfully," as used in this statute, means a voluntary, intentional violation of a known legal duty. In other words, the defendant must have acted voluntarily and intentionally and with the specific intent to do something he knew the law prohibited, that is to say, with the intent either to disobey or to disregard the law. Negligent conduct is not sufficient to constitute willfulness.

17

*Id.* We held that "[t]he jury's conclusion that Tarwater acted willfully would necessarily negate any possibility of 'good faith' in filing false tax returns." *Id.*

In the instant case, the jury instructions indicated that in order to find Defendant guilty of Count 3, the jury must find that Defendant entered into the conspiracy to impede or impair the IRS "knowingly and voluntarily." The government argues that the district court did not err in denying Defendant's proposed jury instruction regarding good faith because it was substantially covered by the instructions that were given. The government claims that the instruction that "substantially covered" Defendant's proposed instruction stated: "The word 'knowingly,' as that term has been used in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident." As in *Tarwater*, this instruction substantially covered Defendant's proposed good-faith instruction because in order for the jury to find Defendant guilty, it would necessarily have to conclude that he intended to agree to impede/impair the IRS and that his actions were not simply the result of following bad advice or accidentally miscalculating his taxes. Accordingly, we affirm the district court's decision not to grant Defendant's motion for acquittal or a new trial because the district court did not issue his proposed jury instruction.

## IV. Sentencing

Defendant was sentenced to 46 months imprisonment. The district court arrived at this sentence after calculating that Defendant had an offense level of 22. Because the court found that Felner's tax loss was reasonably foreseeable to Defendant, it included the amount of taxes Felner avoided when sentencing Defendant. The court, therefore, determined that Defendant was responsible for a tax loss between $400,000 and $1,000,000. Coupled with Defendant's criminal history category of I, his guideline range was 41-51 months.

Defendant contends that the sentence the district court imposed was unreasonable. Defendant makes three arguments to this effect. He disputes base offense level because he believes that the government's witness and the district court failed to calculate his tax loss properly. Defendant also claims that it was improper to attribute the tax loss associated with Felner to him. Finally, Defendant argues that his sentence is unreasonable when compared to Felner's sentence because he was convicted of much less than what Felner pled guilty to, Felner was much more culpable, and Felner profited so much more financially from the conspiracy.

This Court reviews sentencing decisions for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 46 (2007) (citing *United States v. Booker*, 543 U.S. 220, 260-62 (2005)). The district court's determination of the tax loss attributable to Defendant is reviewed for clear error. *United States v. Erpenbeck*, 532 F.3d 423, 433 (6th Cir. 2008). The methodology the court uses to make that calculation, however, is reviewed *de novo*. *Id.* This Court applies a presumption of reasonableness to sentences within the guidelines range. *United States v. Berry*, 565 F.3d 332, 341 (6th Cir. 2009) (quoting *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006)).

### A.     Was Felner's Tax Loss Foreseeable?

The most critical challenge to Defendant's sentence is his claim that the district court erred when it held that Felner's tax loss was foreseeable to Defendant, and, therefore, attributable to him at sentencing. It is clear that irrespective of how Defendant's individual tax loss is calculated, the vast majority of the tax loss Defendant was held accountable for was income Felner did not report to the IRS. At the sentencing hearing, Defendant objected to the government's calculation of his tax loss and claimed that Felner's tax loss was not foreseeable to him. The district court made the following ruling with respect to the foreseeability issue:

19

I don't think the government has to prove that Schroeder walked hand-in-hand and arm-and-arm with Mr. Felner on every bit of Felner's omissions and crimes but that, generally speaking, similar to the analogy used with drug cases, if they had a generalized appreciation of where this was going, and what was happening, and what was going on, they're held responsible for it and – so I think that that is not an improper inference from all the evidence that came in during the trial in this case. They worked closely and they were compatriots in this. And so I think including the figures regarding Felner for tax loss in this conspiracy case is not inappropriate and is, in fact, appropriate in the matter. So on that basis, I'm going to overrule the objection and find that the base offense level has been properly calculated in the presentence report.

A review of the record demonstrates that the district court's ruling was proper. Agent Masterson testified at the sentencing hearing that Felner's tax loss was foreseeable to Defendant because he knew, or should have known, that Felner should have continued to receive 1099s for income he earned from NCPEp. It was not an abuse of discretion for the district court to find that Defendant knew that Felner was not claiming his taxes for the same reasons that there was sufficient evidence to find Defendant and Felner conspired to impair or impede the IRS. Clearly, the tax loss resulting from unclaimed income Felner received from the AB&T account was foreseeable to Defendant because he had exclusive control over that account.

Defendant argues that the tax loss attributable to money deposited by Felner in the Citizens account in Rhode Island should not be attributed to him because he was unaware of that account, and Felner opened it by forging Defendant's signature. Agent Masterson, however, explained that Defendant should still be responsible for the tax loss associated with that account because "the Citizens Bank account was formed with a check from AB&T for $250,000." Furthermore, he testified that "[w]e have documentation that we presented at trial that shows that Mr. Schroeder wire transferred funds to the Citizens Bank account in Rhode Island and received checks back from that

20

Citizens Bank account, and that he was also involved in a stock transaction at one point with the investment account for Citizens Bank account."

With respect to the BB&T account in Kentucky, Agent Masterson explained that "initially when Mr. Schroeder was interviewed . . . he said that he knew about the Kentucky bank account." Additionally, "[t]here was a check from the BB&T Bank account, the NCPEp bank account here in Kentucky to Mr. Feeney's law firm for $2,600 and change to pay for legal fees in 2008 form there." Agent Masterson also explained that Defendant should have reasonably foreseen Felner's tax loss relating to the $450,000 in checks issued from the University of Louisville because "two of the checks were mailed directly to the Rock Island address of NCPEp and passed through Mr. Schroeder's hands. He sent them back via FedEx to Mr. Felner, and they were deposited into the NCPEp bank account. The other check for $50,000, we found the invoice for that payment from U of L in Mr. Schroeder's office."

Based on Agent Masterson's testimony and the other evidence admitted at trial, the district court did not err when it found that Felner's tax loss was a reasonably foreseeable consequence of Defendant's conspiracy with him. Furthermore, because Felner's tax loss alone was above the $400,000 threshold, any errors that the government or district court made when calculating Defendant's individual tax loss was harmless error.[2]

### B.      Substantive Reasonableness of Defendant's Sentence

Defendant further argues that the district court's sentence was grossly disproportionate or disparate when compared to the 63-month sentence Felner received, due to the fact that Felner was more culpable and benefitted substantially more than Defendant from the conspiracy. Defendant also

---

[2] At oral argument, Defendant's counsel admitted that Felner's tax loss was over $400,000.

claims that the district court should have departed from the guideline range because his offense level of 22 overstated the gravity of his offense and he personally realized only a portion of the overall gain. At the sentencing hearing, Defendant also argued that he should be considered as having only a "minor role" in the conspiracy under U.S.S.G. § 3B1.2.

Under 3B1.2, a judge should decrease the base offense level four levels for a minimal participant and two levels for a minor participant. *United States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010). The judge found that "in order to apply this mitigating role, I would have to find that Mr. Schroeder was substantially less culpable than even an average participant and that, based on the evidence in this case, I cannot do." *See Lanham*, 617 F.3d at 888 (quoting *United States v. Lloyd*, 10 F.3d 1197, 1220 (6th Cir. 1993)).

The district court did not abuse its discretion by holding that Defendant was not entitled to a downward departure. When making all reasonable inferences in favor of the prosecution, it cannot be said that Defendant played a "minor role" in this conspiracy. He was the executive director of NCPEp, and was close friends with Felner. Even before establishing NCPEp, they worked together often through UofL, URI, and RICCA. Defendant had control over the AB&T account, and authorized RICCA's payments to Felner. Defendant also failed to give Timmer and his firm requested information and instructions regarding Felner's 1099s from both NCPEp and RICCA. Accordingly, Defendant's sentence is affirmed.

## CONCLUSION

For the reasons stated above, we AFFIRM.

22