NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0500n.06

No. 14-3661

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 24, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|    Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| ANTUN LEWIS | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
|    Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: SUHRHEINRICH, MOORE, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** On May 21, 2005, a fire at a Section 8 rental home in Cleveland, Ohio, killed eight children and one adult. Two other adults escaped the fire, one of them with severe burns. Three years after the fire, Antun Lewis was charged with arson resulting in death in violation of 18 U.S.C. § 844(i). In 2011, following a four-week jury trial, Lewis was convicted. Lewis filed a post-conviction motion for new trial, pursuant to Federal Rule of Criminal Procedure 33(a), which the district court granted, and which this court later affirmed. *United States v. Lewis*, 521 F. App'x 530 (6th Cir. 2013). The case was tried again in late 2013. Again a jury found Lewis guilty, and again Lewis filed a motion for new trial, which the district court this time denied. Lewis appeals, asserting that the jury's verdict was against the manifest weight of the evidence. Lewis also complains that the government committed prosecutorial misconduct and that his prosecution under the federal arson statute,

18 U.S.C. § 844(i), was an improper use of federal power. For the reasons stated herein, we affirm the district court.

I.

Early in the morning of May 21, 2005, the house at 1220 E. 87th Street ("1220 House") in Cleveland, Ohio burned down. Medeia Carter, an adult, and eight children died in the fire. Two adults, Capretta Nicole Bell and Teon Smith, survived; Bell with severe burns. It is undisputed that Carter rented the 1220 home, and that she did so with Section 8 funds. It is also undisputed that arson caused the fire.

On October 1, 2008, Lewis was charged with arson resulting in death in violation of 18 U.S.C. § 844(i), which provides that "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce" is subject to imprisonment.

At the initial trial, the government presented three primary categories of evidence: 1) Marion Jackson's purported eyewitness testimony, the most direct and comprehensive account of Lewis's alleged involvement in the fire; 2) testimony from inmate informants who claimed to have heard Lewis incriminate himself; and 3) testimony from community members regarding incriminating statements Lewis made about the fire and his possible motives for setting it. After a four-week trial, a jury convicted Lewis.

Six weeks later, Lewis filed a motion for new trial, claiming that the jury's verdict was against the manifest weight of the evidence. Three months after that, he filed a second motion for new trial based on newly discovered evidence that the government's informants allegedly

conspired to frame Lewis. The district court held hearings on those motions and eventually granted Lewis a new trial.

The court found that Jackson's testimony was "significantly undermined" by numerous discrepancies, including inconsistencies between Jackson's various statements to law enforcement, between these statements to investigators and his trial testimony, and between his testimony and other witness testimony. The court also discounted the testimony of the inmate informants, noting that it was uncannily similar, that it was based mostly on readily available public information, and that the motive ascribed to Lewis—that someone in the house owed Lewis a drug debt—was rebutted by testimony that no one in the house used drugs. Finally, the court questioned the credibility of the other community witnesses, noting that parts of their testimony were not corroborated by Lewis's cellphone records. Given all of the infirmities in the government's case, the district court concluded that the evidence adduced at trial weighed heavily against the verdict and granted Lewis a new trial. The government appealed. We affirmed, although without making any "statement as to whether such proof could sustain a guilty verdict." *Lewis,* 521 F. App'x at 541.

On December 13, 2013, a second jury convicted Lewis of arson resulting in death in violation of § 844(i). Lewis filed another Rule 33 Motion for New Trial, which the district court, in a thorough and thoughtful opinion, denied. Lewis timely appeals.

## II.

Under Federal Rule of Criminal Procedure 33(a), a district court is empowered to order a new trial "if the interest of justice so requires." In making this determination, a district judge "may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). A motion for new trial

should be granted only "in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *Id.* (citation omitted).

We review a district court's denial of a motion for new trial for abuse of discretion, *United States v. Holder*, 657 F.3d 322, 328 (6th Cir. 2011), with an understanding that "new trial motions are disfavored and should be granted with caution." *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001). "A district court abuses its discretion when it applies an incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *Holder*, 657 F.3d at 328 (quoting *United States v. Pugh*, 405 F.3d 390, 397 (6th Cir. 2005)). In reviewing Rule 33 motions, we afford the district court a great deal of latitude, in recognition of the fact that "the trial judge, not an appellate court reading a cold record, can best weigh the errors against the record as a whole to determine whether those errors in the conduct of the trial justify a new trial." *United States v. Breinig*, 70 F.3d 850, 852 (6th Cir. 1995) (citation omitted). Unlike the district court, we do not function as a thirteenth juror, and thus, we will not second-guess a district court's credibility determinations but rather review those determinations for a "clear and manifest abuse of discretion." *United States v. Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2003) (citation omitted).

On appeal, Lewis alleges that the government's cases in the first and second trials were virtually identical and that the district court, rather than granting Lewis's motion as it had after the first trial, simply changed course and "held all the inconsistencies and unanswered questions were issues for the jury to decide." Appellant Br. at 32. Lewis's contentions are not borne out by the record. At the first trial, the government called a total of thirty-eight witnesses, and Lewis called seven. At the second trial, the government called fifty-eight witnesses, and Lewis called seventeen, including himself.

Despite calling additional witnesses, however, the core of the government's case stayed the same. The prosecution relied mainly on Jackson's eyewitness testimony, the testimony of six inmate informants who claimed to have heard Lewis confess, and testimony from community members who knew Lewis, who heard him make inculpatory statements about the fire, and to whom Lewis gave inconsistent alibis regarding his whereabouts on the night of the fire. Lewis contends that, in relying on the same theory of the case as before, the government did nothing to bolster the deficiencies apparent at his first trial. The government counters that there were significant differences between the first and second trials, including an additional alibi attributed to Lewis, no testimony offering an innocent explanation for the gasoline smell emanating from Lewis's van ten minutes after the fire, evidence further bolstering Jackson's recollection of the night of the fire, additional corroboration of the inmate testimony, and testimony that Lewis carried a second cell phone.

There were also significant differences between the defense's case in the first and second trials. First and foremost, Lewis himself testified. There was new testimony from inmate Michael Miller, who described a scheme among the inmate informants to frame Lewis for the arson. The defense called Steve Gambetta, an investigator for the Federal Public Defender, whose testimony cast doubt on Jackson's timeline for the night of the fire. Finally, the defense offered the testimony of Janine Chisholm, who stated that she was with Lewis on the night of the fire.

In denying Lewis's motion, the district court made numerous references to the difficulty of the case, noting that it was "marred by witnesses with memory lapses in critical areas and credibility issues abounding." DE 523, Order, Page ID Page 16213. But the court pointed out that most issues, namely the credibility of witnesses and evidence, were left open to

interpretation and were for the jury. The court ultimately concluded that this case was so close that neither a guilty nor a not-guilty verdict would heavily preponderate against the evidence.

In addition to his general contention that the first and second trials were virtually identical, Lewis argues that six specific aspects of the trial demonstrate that the jury's verdict was against the manifest weight of the evidence. We now address each of these aspects in turn, and we also discuss two new pieces of evidence adduced at the second trial which support the jury's guilty verdict: Lewis's own inconsistent statements and an additional inconsistent alibi attributed to Lewis by James Stokes.

1.      Marion Jackson

As in the first trial, the government's case-in-chief at the second trial revolved around Jackson's eyewitness testimony. At the time of the fire, Jackson was fifty-five years old, in poor health, and had a long criminal record. Jackson, known by the nickname "Pops," has a sixth-grade education, and suffers from a variety of mental and physical ailments including post-traumatic stress disorder, bipolar disorder, diabetes, and heart disease. He has spent a large portion of his life in state hospitals and prisons. At trial, he conceded that he had trouble with his memory.

Jackson testified that he met Lewis through Samantha Collins, a prostitute whom Lewis denied knowing. Jackson believes he earned Lewis's trust by telling him that he spent a considerable amount of time in prison. According to Jackson, approximately three days before the fire, Lewis told him that he "wanted a house to be set on fire . . . because somebody owed [Lewis] money." DE 458, Trial Tr., Jackson, Page ID 11915. Jackson eventually remembered that the money was for "dope," *id.*, and he testified that Lewis told him that, 'the bitch had to die because she has taken his money for the last time." *Id.* at 11917. According to Jackson, Lewis

offered him $1,500 to set the fire. Jackson declined, and Lewis allegedly threatened to blame the fire on Jackson if he did not agree to serve as Lewis's lookout.

On the night of May 20, 2005, Lewis called Jackson and told him to wear dark clothing and meet him on the east side of Cleveland. Jackson took two buses from his home and arrived at East 85th Street and Superior Avenue. There, he met Lewis, who handed him a beer, and the two walked around for a while. Jackson stated that during this time he was "in a daze" because he hadn't taken his medication or eaten that day. *Id.* at 11923. Jackson testified that he and Lewis next walked down Superior towards East 87th Street and stopped one house away from the 1220 House. At this point, Jackson observed "either a cookout or a party" in an open field at the end of East 87th Street. *Id.* at 11927. He specifically remembered smelling food. Jackson said that after walking to the 1220 House, he and Lewis walked west back down Superior. On their walk, Lewis acquired two gas cans, one plastic and one metal, and Jackson observed Lewis fill the cans with $5 worth of gas from the Citgo at East 76th Street and Superior. The pair then returned to the 1220 House.

Jackson testified that, while they were on East 87th Street, Lewis received a phone call and he asked the caller "was the bitch in the house." *Id.* at 11932. After the call ended, Lewis put the phone in his pocket and started walking quickly down East 87th towards the 1220 House. Jackson said he crossed to the other side of the street across from the 1220 House where he watched Lewis walk down the driveway, disappear behind the house, and then enter the house from the side door. Jackson also testified that the party in the empty lot was still ongoing at that time. Shortly after Lewis entered the house, Jackson saw smoke coming from under the front door. At that point, Jackson walked down East 87th Street toward Superior, and when he turned around, he saw Lewis standing in the middle of the street. Jackson said that he got on a bus at

East 85th Street and Superior and went home. He claimed that Lewis called him several times after the fire and threatened to hurt him if he said anything

A few months after the fire, Jackson was arrested and charged with kidnapping, aggravated burglary, and attempted felonious assault. While these charges were pending, Jackson shared a cell with Paul McKeever at the Cuyahoga County Jail. Jackson knew McKeever, a seasoned jailhouse informant, from a previous incarceration in the Ross Correctional Facility. Jackson testified that after seeing a news story about the fire at the County Jail, McKeever approached him. Jackson told McKeever that he knew something about the fire, and McKeever put him in touch with ATF Special Agent John Gregg.

Jackson met with Gregg and Fire Marshal Ray McCarthy on September 30, 2005. He admitted his involvement in the fire and provided Gregg and McCarthy with a statement of events. He also provided a drawing of the gas cans Lewis used and a drawing of East 87th Street. (*Id.*) In exchange for his assistance, Jackson received subsistence and lodging expenses from ATF for nearly four years, and, in 2008, he received immunity for federal prosecutions related to the 1220 House arson. Agent Gregg also appeared in court with Jackson after Jackson violated his probation stemming from a misdemeanor assault conviction.

Lewis attacks Jackson's credibility on multiple grounds. He first criticizes Jackson's shifting and uncorroborated timelines. At trial, Jackson admitted that he told a grand jury that it took fifteen minutes for him and Lewis to share a beer near Superior Avenue and East 87th Street, walk to the 1220 House, walk back to Superior Avenue, retrieve gas cans, purchase gas from the Citgo on East 76th street, and walk back to the 1220 House. In a statement to investigators, however, Jackson estimated that he was with Lewis for five hours on the night Lewis set the fire.

There was also testimony from Steve Gambetta, an investigator called by the defense who did not testify at the first trial, which contradicted Jackson's timeline. Gambetta retraced the path Jackson described in his trial testimony and testified that, without making any of the stops Jackson testified to, it took him thirty-four minutes, not fifteen, to walk the route Jackson described. On cross-examination, however, Gambetta conceded that there was ample time to walk this route between 1:40am and 2:53am, the time when Lewis's cellphone records do not account for his whereabouts. In light of Gambetta's concession, the district court concluded that the "only evidence directly refuting the possibility that Lewis and Jackson were together during this time frame [was] Lewis's own testimony." DE 523, Order, Page ID 16184.

Lewis additionally contends that Lahemma Collins's testimony calls into question Jackson's recollection of the night of the fire. Collins, who lived in the house between the 1220 House and the empty lot, testified that there were often parties in the open lot, but that she did not remember a party on the night of May 20th or the early morning of May 21st. However, on cross-examination, Collins admitted that people could have gathered in the lot without her noticing. Michael Spates, a government witness, testified that there was a "nice crowd" congregated in the open lot on the night of the fire. DE 498, Trial Tr., Spates, Page ID 15394. Spates further testified said he was with in the field with others at the time he noticed the fire at the 1220 House. Bruce Thomas and Shawnta Richardon also testified that there were people in the open lot partying and barbequing on the night of the fire, although neither witness specified whether there was a party happening at the time the fire started.

In assessing Jackson's credibility on these points, the district court noted that "[e]ach important inconsistency and alteration was put before the jury and the issues regarding his credibility were made known at trial." DE 523, Order, Page ID 16215. For example, Jackson

acknowledged at trial that he provided inconsistent statements about the night of the fire, and he freely admitted that he had problems with his memory and difficulty with time. The district court acknowledged that the inconsistencies in Jackson's timeline were troubling and raised "substantial credibility issues," but the court found that the jury was aware of Jackson's weaknesses as a witness and "could have concluded . . . that despite Jackson's inconsistencies, the substance of his story was true." *Id.*

Next, Lewis asserts that he and Jackson did not know one another at the time of the fire. Lewis argues that two pieces of evidence, his cell phone records and a recorded conversation between Jackson and Lewis, bear out this theory.

When Jackson was arrested on August 3, 2005, he provided his cell phone number to police. This number does not appear in Lewis's cell phone records. However, at trial, Jackson maintained that he could not remember what his cell phone number was in May 2005. Moreover, several witnesses testified that Lewis carried more than one phone, although no second phone was ever identified or recovered in this case. Additionally, multiple numbers in Lewis's cellphone records lack subscriber information and, thus, could have belonged to Jackson. The district court was satisfied that the "[j]urors could have deduced from this testimony and evidence that Jackson and Lewis knew one another despite a lack of phone records connecting the two." DE 523, Order, Page ID 16183–84.

On December 27, 2005, Jackson visited Lewis while Lewis was being held at the Cuyahoga County Jail. Their conversation was recorded and the transcript was presented at trial. Early in the conversation, Jackson voiced concerns that he might be implicated in the fire, telling Lewis, "I'm not going to take the rap for it, okay." DE 472-1, Trial Ex., Page ID 13000–01. Lewis immediately responded, "I know that. I didn't even think they'd [sic] come to see me." *Id.*

at 13001. It was not until about three minutes into the conversation that Lewis told Jackson, "I've never even seen you before . . . I don't even know your name sir." *Id.* at 13002. Given the length of time it took Lewis to disavow any familiarity with Jackson, particularly considering the content of their conversation beforehand, the district court concluded that the conversation was "open to interpretation and created an issue of credibility for the jurors to weigh when assessing both Jackson and Lewis's individual credibility." DE 523, Order, Page ID 16185. This conclusion was not an abuse of discretion.

The district court did not abuse its discretion in weighing Jackson's credibility, particularly in light of other evidence that lends credence to his account of the early morning hours of May 21, 2005. Jackson's testimony that Lewis received a phone call shortly before setting the fire was corroborated by Lewis's cellphone records, which show he received a call at 2:53am while Lewis was in the same cell site sector as the 1220 House. Jackson's recollection that Lewis bought $5 worth of gas was also corroborated by Lewis's statement to Special Agent Illig that he bought $5 of gas. Likewise, Jackson's testimony about a party or cookout in the open lot was corroborated by multiple witnesses.

2.    Cell Phone Records/Timeline

Lewis next argues that there are substantial problems with the government's timeline immediately before and during the fire. Jackson testified that just before Lewis set the fire, Lewis received a phone call. Phone records show that Janine Chisholm called Lewis at 2:53:25am, and that call lasted twenty-three seconds, ending at 2:53:48am. At the time he received this call, Lewis was in the cell site sector encompassing the 1220 House. Jackson stated that immediately after ending the call, Lewis walked down the driveway, entered the house through a side door,

poured gasoline on the first floor of the home, and started the fire. The Cleveland Fire Department received and recorded the first fire alarm call at 2:54:04am.

Lewis argues that it would have been physically impossible for him to carry two gas cans from the street to the side entrance of the home, pour the gasoline out on the first floor, and set the fire in the sixteen seconds between the end of his call with Chisholm and the first call reporting the fire.

At trial, there was a dispute about the comparability of Lewis's cell phone records, which are synched to GPS time, and the Cleveland Fire Department call logs, which are not. Captain Michael Majercak testified that the Fire Department records call times solely in order to measure response time, not to record the precise time a call comes in. He stated that the alarm records are a "rough time." DE 494, Trial Tr., Majercak, Page ID 145490, 14593.  Majercak observed that, in the past, the recorded alarm time has been as much as ten minutes off from the time on the Department's computer, and that he tries to resynchronize the clock but does not keep a record of when this is done. Majercak further noted that when he does resynchronize the alarm time, he checks it against the department's CAD computer system. The district court observed that there was no testimony in the record showing that the CAD system was synchronized to GPS time. Greg Kelley, a forensic expert for the defense, conceded that if the department's call log times were inaccurate, his analysis regarding the 911 calls would also have been off.

In the district court's view, "the jury was presented with sufficient testimony to evaluate the accuracy of the government's timeline" and "[w]ithout precise records that synched to the same common time, it was difficult to tell exactly how Lewis's cell phone records correlated to the emergency alarm times." DE 523, Order, Page ID 16209, 16218. Given the difficulty of accurately comparing Lewis's call times with the fire department's call logs, it was not error for

the district court to find that the jury was free to credit the government's timeline in spite of Lewis's cellphone records.

        3.      Insufficient and Inconsistent Proof of Motive

Lewis also assails the jury verdict on the grounds that the government offered insufficient and inconsistent evidence of Lewis's motivations for starting the fire. Despite the fact that the government was not required to prove motive under § 844(i), the prosecution presented significant testimony detailing two possible motives for Lewis's crime: "the bond dispute" and "the drug debt."

The first theory, "the bond dispute," was that Lewis set the 1220 House on fire because he was angry with Sharese Williams for taking his clothes and thought she was in the house on May 21, 2005. In April 2005, Williams was the signatory on two bonds for Lewis. While he was out on bond, Lewis stayed with Williams and her family. Williams drove Lewis to court for a hearing on May 9, 2005, but he did not appear in court that day, thereby forfeiting his bond. When Williams found out, she spoke with Lewis about the need to turn himself in. After Lewis refused, Williams took two bags of Lewis's clothing from his mother's house to use as leverage to force Lewis to turn himself in.

Lewis asserts that "not a single person testified Lewis was upset at Sharese" for taking his clothes. Appellant Br. at 40. This position is clearly rebutted by the trial transcript. George Hightower testified that Lewis was a "neat dresser" who "wore nice clothes, very nice clothes." DE 432, Trial Tr., Hightower, Page ID 10377. On the morning of the fire, Hightower overheard a phone call between Lewis and his mother where Lewis was angry and yelled, "Ma, how could you let that bitch take my shit? You know those were my clothes." *Id.* at 10377–79. Lewis did not dispute that this call happened, but he denied that he was yelling or angry. Hightower also

testified that he knew that Sharay, Williams's daughter, told Lewis that Williams would be at the 1220 House the night of the fire. Additionally, three other witnesses testified that Lewis mentioned Williams and the clothes. Special Agent Illig testified that during a conversation with Lewis ten days after the fire, Lewis expressed anger with Williams for taking his clothes. Charise Frazier and Carmella Smith also both testified that during a conversation about the fire, Lewis told them he was angry with Williams for taking his clothes.

The district court concluded that the "the Government presented evidence from which one could conclude that [Lewis] was angry with [Williams] for taking his clothes . . . [and that] Lewis was told he could expect to find Williams at the 1220 House on the night of the fire." DE 523, Order, Page ID 16172. Based on the record, "[t]he jury could have inferred . . . that Lewis had a motive to set the fire." *Id.*

In addition to the "bond dispute" theory, several witnesses testified that someone in the 1220 House owed Lewis a drug debt. Jackson testified that Lewis received a phone call just before he set fire to the house where "he asked was the bitch in the house." DE 458, Trial Tr., Jackson, Page ID 11932. And Jackson admitted that in a prior statement he told investigators that Lewis said, "Is the bitch Nicole [Bell] there?" *Id.* at 11933–34. At trial, Jackson maintained that the "target of [Lewis's] rage was some woman named Nicole." DE 459, Trial Tr., Jackson, Page ID 12045. Three other witnesses also testified that Nicole Bell was the target of the fire. *See* DE 442, Trial Tr., McKeever, Page ID 10919; DE 447, Trial Tr., Id'Deen, Page ID 11222; DE 448, Trial Tr., Wheeland, Page ID 11304–05.

At trial, there was significant testimony that no one in the 1220 House, including Bell, used drugs. Bell testified that neither she nor Medeia Carter used drugs and that Carter would not tolerate drug use in her house. Evelyn Martin, Carter's mother, testified that Carter did not use

drugs and would not allow drug use in her house. Sharese Williams also testified that Carter and Bell did not use drugs.

The problems with the "drug debt" theory alone are not enough to cast serious doubt on the jury's verdict. Motive is not a requisite element for conviction under § 844(i), and, as the district court observed, "[i]f the jurors believe[d] the testimony that Lewis admitted to planning or setting the fire, they need not necessarily believe that the fire was set over a drug debt." DE 523, Order, Page ID 16174. The lack of evidence that anyone in the 1220 House used drugs does, however, raise credibility concerns for the multiple witnesses who attested that Lewis set the fire because he was owed money for drugs. The government argues that it was not attempting to ascribe an actual motive to Lewis but was rather presenting evidence of what he told others his motivation was. The jurors were aware of the evidentiary weaknesses of the drug debt theory, and they were free to weigh the witnesses' credibility in light of those problems.

4.     George Hightower

Lewis next asserts that Hightower's credibility was significantly undermined at the second trial. Hightower, a prosecution witness, testified that on May 21, 2005, Lewis called him at 2:56am and said that he was on the way to Hightower's house. Hightower claimed that eight minutes later, at 3:04am, he was looking out his window, saw Lewis's van in his driveway, and called Lewis's phone. At this point, he went outside to speak with Lewis and smelled gasoline emanating from Lewis's van. Hightower stated that he overheard his neighbors discussing that Moses Marshall's house was on fire, which he took to mean that Marshall's grandmother's house on Decker Street was on fire. At this point, fire trucks could be heard, and Hightower testified that he told Lewis that the trucks must be going to the house on Decker. (*Id.* at 10398.)

Hightower specified that, at this point, Lewis corrected him and said "87th . . . I told you, 87th. You don't know shit about it." DE 432, Trial Tr., Hightower, Page ID 10398.

According to Hightower, the pair then went inside Hightower's house and Lewis stayed there until morning. Hightower testified that he left his home twice during the early morning hours of May 21, 2005, and that on his second trip out, he heard a rumor that Lewis was involved in the fire. Upon returning home, Hightower confronted Lewis with the rumor, but Lewis denied any involvement and left.

Lewis contends that his cellphone records discredit Hightower's statement that Lewis arrived at his house at 3:04am and stayed there all night. The cellphone records show that shortly after 3:00am, Lewis was in the same cell sector as Hightower's house, but from 3:37am until 4:17am, Lewis's call logs show that his location alternated between Hightower's sector and the neighboring sector encompassing "the Browns," a housing project on Cleveland's east side. Doug Smith, an engineer for Revol Wireless, testified that this meant either that Lewis was physically moving between cell site sectors or that his calls were hitting off of both cell towers. From 4:20am until noon on May 21, 2005, all of Lewis's calls show that he was in the same sector as Hightower's home. In evaluating Hightower's credibility on this point, the district court noted that Hightower left his home twice and thus would not be able to accurately account for Lewis's whereabouts for the entire night.

Lewis also points to a series of twenty-three phone calls Hightower made to Lewis between 11:17pm and 12:26 am on May 20 and 21, 2005. Hightower testified that Lewis was at Hightower's house using Hightower's cell phone to call his own phone in order to listen to a new ringtone Lewis had just installed. However, Lewis's cellphone records showed that he was not in the cell sector encompassing Hightower's house during this time. Hightower ultimately admitted

that he did not remember what the calls were about. The district court concluded that "Hightower's uncertainty about those phone calls was made known to the jury, and the jury could evaluate that testimony accordingly." DE 523, and Order, Page ID 16200–01.

Lewis's cellphone records cast doubt on Hightower's testimony in some ways, but they also support Hightower's version of events in the minutes immediately after the fire. The records show that Lewis was in the same cell site sector as the 1220 House when he called Hightower at 2:56am, and they show that when Hightower called Lewis at 3:04am, Lewis was in the same sector as Hightower's house. Additionally, two of Hightower's neighbors, who did not testify at the first trial, corroborated Hightower's account of Lewis's arrival around 3:00am. Phillip Marshall testified that around that time he saw a van in Hightower's driveway Likewise, Mosetta Evans stated that at approximately 3:00am she saw a van, which she believed was Lewis's, speed down Kenmore and pull into Hightower's driveway. Special Agent Illig's account of his May 31, 2005, interview with Lewis also corroborates Hightower's version of events. When Lewis accounted for his whereabouts between 2:30am and 3:00am, Lewis told Illig that he drove down Kenmore directly to Hightower's where he saw three people on the porch next door. Not only does this testimony bolster Hightower's credibility, it varies markedly from Lewis's own trial testimony about when he arrived at Hightower's house. Lewis stated that he got to Hightower's house around 4:20am where he observed three people on the porch next door and emergency vehicle lights further down the street. He claimed that he did not know about the fire at this point.

Finally, Lewis points out that Hightower did not mention smelling gasoline in Lewis's van when he was initially questioned on May 22, 2005. When he was asked about this at trial, Hightower admitted that he did not initially volunteer this information and that he was never

asked a question about it. In explaining this initial omission, Hightower expressed his fondness for Lewis and his reluctance to cooperate with law enforcement.

In evaluating Hightower's credibility, the district court noted that Hightower's "account[] of when Lewis arrived at Hightower's house on the night of the fire . . . [was] supported by cell phone records . . . [and] supported by the testimony of independent witnesses." DE 523, Order, Page ID 16127. The district court ultimately concluded that "[i]f the jury found Hightower's testimony and time line to be credible, his testimony was evidence from which the jury could have concluded that Lewis arrived at his home around 3:00am, in a van smelling like gasoline, already with knowledge of the fire." *Id.* at 16218. This was not an abuse of discretion.

5.      The jailhouse informants

As in the first trial, the government presented testimony from six inmate informants regarding statements Lewis allegedly made implicating himself in the arson. Lewis attacks the credibility of the informants, arguing that nothing was done to bolster the credibility issues apparent at the first trial. Moreover, unlike at the first trial, Lewis presented the testimony of Michael Miller, another inmate, who testified that the informants conspired to falsely incriminate Lewis.

a.      Paul McKeever

McKeever, a recidivist sex offender and seasoned jailhouse informant, testified that in May or June 2005, he met Lewis in the medical unit at the Cuyahoga County Jail. He allegedly overheard Lewis tell another inmate in regards to the fire, "the bitch got what she deserved." DE 442, Trial Tr., McKeever, Page ID 10748. Following this, McKeever contacted law enforcement in the hopes of receiving a benefit for providing information.

McKeever further testified that in September 2005, he encountered Jackson at the County Jail. McKeever knew Jackson from a prior stint in prison and observed Jackson watching television when news of the fire came on. McKeever stated that Jackson appeared upset, and McKeever asked him what was wrong. Jackson told him that he knew who set the fire, "Ant," and that he knew this person through Samantha "Sam" Collins. McKeever said he called McCarthy, the fire marshal, with this information, and convinced Jackson to talk with McCarthy.

In the late spring of 2006, at ATF's request, Lewis was transferred to Grafton Correctional Institution, where McKeever was incarcerated, so that McKeever could collect information from Lewis. McKeever testified that he gained Lewis's trust and Lewis eventually confided in him that he set fire to the 1220 House, and that he was worried about "Pops" (Jackson), who was standing across the street when he set the fire. According to McKeever, Lewis told him that he and Pops filled two cans with gasoline, and that Pops was supposed to set the fire but backed out. Lewis also told McKeever that he entered the house through the side entrance, poured the gasoline, and set the fire. McKeever further testified that he overheard Lewis shout to another inmate to "get Pops." DE 442, Trial Tr., McKeever, Page ID 10835. Finally, McKeever stated that he received no benefit from the government for his testimony.

Lewis attacks McKeever's credibility on the grounds that McKeever falsely claimed that he did not know Collins. At trial, both McKeever and Collins denied knowing each other. However, numerous connections between McKeever and Collins brought these claims into doubt. In 1992, McKeever was involved in an auto-theft case. His co-defendant, Jeff Janosek, was married to Collins at the time. McKeever called this an "awful coincidence." *Id.* at 10900. Janosek testified that he and Collins were married in 1991 so that Collins could emancipate

herself from her parents, but that he had not seen her since a few days after they were married. Janosek further stated that he was not aware that Collins and McKeever had ever met.

Additionally, in 2007, McKeever's step-mother and step-brother lived in the same apartment complex as Collins and her then-husband Frank Williams. McKeever denied knowledge of this fact and stated that he hadn't spoken to his stepmother and stepbrother since he was a kid. Collins stated that she did not know McKeever's step-mother or step-brother. And both McKeever's step-mother and Frank Williams testified that they were unaware of any connection between McKeever and Collins.

The district court observed that each individual potentially linking McKeever and Collins testified to their relationship with both individuals, and that the jury was free to determine that no connection existed.

b.      The Other Informants

Five other informants testified that they heard Lewis make incriminating statements about his involvement in the fire. Anthony Collier, a prisoner at Grafton in the summer of 2006, testified that he overheard Lewis tell another inmate to find "Pops" and that Nicole "got burned in the fire, but she lived and still looked good." DE 469, Trial Tr., Collier, Page ID 12410–11. After Collier heard these statements, he and McKeever became cellmates in July 2006. Collier admitted that he did not notify law enforcement of what he had heard until July or August 2006, although he denied telling McKeever what he overheard Lewis say. Collier further testified that in exchange for his testimony, ATF wrote a letter on his behalf to the Ohio parole board in 2009 and that he was paroled shortly afterwards. In 2010, however, Collier was convicted of three counts of robbery and sentenced to two years prison on each count. He testified that he received

no benefit from the government for these post-parole offenses. In fact, the government requested the maximum sentence for his crimes with no regard for his assistance in the case against Lewis.

Daniel Id'Deen testified that he overheard a conversation between McKeever and Lewis at Grafton. He allegedly heard Lewis tell McKeever that Pops chickened out, so Lewis had to set the fire himself, and that he was worried about Pops. Id'Deen also allegedly heard Lewis tell McKeever that he went in through the side entrance and poured the gasoline, all while Pops was standing across the street. He also allegedly heard Lewis say "it wasn't meant for those kids, it was meant for that bitch Nicole." DE 447, Trial Tr., Id'Deen, Page ID 11221–22. Additionally, Id'Deen mentioned that Richard Wheeland was present during the conversations he overheard.

Wheeland, who admitted that he was once McKeever's cellmate at Grafton, testified that he heard Lewis tell McKeever "it wasn't meant for those kids, it was meant for Nicole" and that he was worried about Pops. DE 448, Trial Tr., Wheeland, Page ID 11304–07. Wheeland's testimony was bolstered at the second trial by testimony from his girlfriend, Madelon Kominic. She testified that in May or June 2006, he called her and expressed concern about something he overheard regarding the fire. Kominic stated that Wheeland was initially hesitant about going to the police, but that she contacted investigators at his request.

Cyle Watson testified that he was incarcerated with Lewis at Belmont Correctional Institution in 2006, where Lewis allegedly told him, "I think I killed some kids. I'm pretty sure I killed the kids. It was over this bitch." DE 469, Trial Tr., Watson, Page ID 12473. Watson asked Lewis why he set the fire and Lewis stated that "[t]he bitch ripped me off some money, some dope." *Id*. Lewis also told Watson that he was worried he would get caught because of an "old man." *Id.* at 12474. When asked about his relationship with McKeever, Watson admitted meeting McKeever when he came to Belmont in April 2008. Watson testified that he and

McKeever had lots of contact at Belmont and that he cut McKeever's hair. Watson did not speak to law enforcement until August 2008. Watson testified that he received no benefit for testifying.

Finally, Chris Myers testified that while he was incarcerated with Lewis at Belmont in 2007, Lewis told him that a man named "Pops" had snitched on him for starting a fire and that "some kids got caught up in it." DE 469, Trial. Tr., Myers, Page ID 12510–11. Myers also testified that Lewis told him he started the fire over some "dope." *Id.* at 12512. Like the other informants, Myers has connections to McKeever. He testified that he and McKeever shared the same prison pod at Belmont between May and July 2008, which is also when Myers first related his story to law enforcement. Myers testified that he received no benefit from the government, and at the time he testified at trial, Myers' sentence was complete.

In assessing the informants' credibility, the district court observed that they were all "linked in some way to McKeever, a known informant who had received benefits for his testimony in previous cases." DE 523, Order, Page ID 16216. Further, the court noted that the informant testimony was not identical but it did "share[] the same general outline and information." *Id.* The court credited Kominic's testimony, which provided an account of Wheeland's motives for coming forward independent of any connection with McKeever. Ultimately, the district court was satisfied that jury was aware of all of the problems with the informants' testimony, and that it was free to evaluate the informant's credibility in this light.

c.     Michael Miller's Testimony

At the second trial, Lewis attempted to rebut the informants' testimony with the testimony of Michael Miller, a convicted felon with a lengthy and serious criminal history, including two convictions for providing false information to police. Miller testified that he met McKeever while he was incarcerated at Cuyahoga County Jail in 2010. He said that the two

often talked and that he loaned McKeever his phone card. At one point, McKeever allegedly asked Miller if he would like to help McKeever and a few of his friends frame someone in a high-profile case. On direct examination, Miller struggled to name the other members of the alleged conspiracy, but eventually named: "Pops," "ID," either "Craig" or "Greg," "Sam," "Marion," and "Myers." DE 468, Trial Tr., Miller, Page ID 12267–69, 12297.

Miller testified that when Lewis was initially convicted, he read about the conviction in the *Cleveland Plain Dealer* and understood the gravity of McKeever's plan. Miller averred that he prepared a "kite"—slang term for prison letter—handed it to an officer on shift, who decided not to deliver the kite, and instead, contacted Lisa Cantoni, a prison investigator, on Miller's behalf. Miller claimed that he spoke with Cantoni and that she assured him that she would pass the information along to the police. Miller admitted that he hoped for some sort of benefit for his cooperation. Miller later contacted Lewis's attorneys and told them what McKeever had told him.

Melissa Cantoni, a Lorain Correctional Institution investigator, testified that based on her records and recollections, she never spoke with or received word from Miller about this case. She said that had she been presented with the type of information Miller claimed to have, she would have made a record of it. William Elliot, a former friend and employee of Miller's, testified that he received a letter from Miller between March and July 2011 stating that Miller was "fabricating a story, to benefit himself with time off of his sentence, about an arson fire." DE 498, Trial Tr., Elliott, Page ID 15375–77. The district court ultimately concluded that Cantoni and Elliot's testimony was "damaging to Miller's credibility and provided the jury with a sufficient basis to disbelieve Miller's testimony." DE 523, Order, Page ID 16216.

6.    Samantha Collins

As she did at the first trial, Samantha Collins testified for the government. Collins testified that, in 2005, she was addicted to crack cocaine and was working as a prostitute. She admitted that her drug use affected her memory and her perception of time. Collins also stated that Lewis was at her apartment quite often, and that about three weeks before the fire she heard Lewis complaining that people owed him money, including people in a house on the east side of Cleveland. Collins said that about a week after his initial rant, Lewis stated that "he was going to kill them, burn them all out." DE 452, Trial Tr., Collins, Page ID 11398. Finally, Collins stated that a week before the fire, Lewis told her that "he was going to shoot them, but then there would be too many, so he would burn them." *Id.* at 11402. She said that this was the last time she spoke with Lewis. Collins admitted that she received $1,000 in moving expenses from law enforcement for her testimony in this case after she received threatening phone calls about her cooperation.

Lewis asserts that his cell phone records contradict Collins's testimony. The records show Lewis's call history for the entire month of May 2005 and reveal that there were no calls between Collins and Lewis. Furthermore, the records indicate that Lewis did not receive or place a call from the west side of Cleveland during the entire month. However, several witnesses, including Collins, testified that Lewis carried two cellphones. Smith also testified that there were multiple numbers in Lewis's records without subscriber information. The apparent discrepancies between Collins's testimony and Lewis's cellphone records simply raised another credibility issue for the jury.

Lewis also attacks Collins's drug-debt testimony. Like the other witnesses who attested to Lewis's drug-debt motive, Collins did not testify to a personal knowledge of any drug debt;

she stated only that she heard Lewis ranting about it. As noted earlier, Collins' credibility on this point was also properly before the jury.

      7.     Lewis's Inconsistent Statements

One of the key features of the government's case against Lewis was the inconsistent statements he made regarding his whereabouts during and after the fire. On May 31, 2005, ATF Agent Don Illig interviewed Lewis regarding his activities on the night of the fire. Illig testified that Lewis told him that he spent most of the day at Hightower's house, but that at some point he left in his van and purchased $5 worth of gasoline. After he purchased the gas, he retrieved a CD from Hightower's house and then went directly to the Brown's housing project, parked, listened to music, had phone calls with Sharese Williams and her daughter Sharay, all before returning to Hightower's house later that night.

At trial, Lewis altered this story. He stated that at some point in the evening of May 20, 2005, he left his van at 89th and Superior, and thereafter, Janine Chisholm, a woman Lewis was romantically involved with, picked him up at 88th and Superior. Lewis stated that he and Chisholm drove to his father's and grandmother's house in the Union Avenue area and kissed for a while in Chishom's car. Lewis's phone records showed that he received a call at 1:39am in the Union Avenue cell sector. Lewis stated that Chisholm left shortly afterwards but that he stayed at his grandmother's for a while before taking a bus and walking back to his van. The district court noted that Lewis never told investigators about his time with Chisholm. Additionally, while Chisholm testified that she spent time with Lewis on the night of the fire, she previously told investigators that she had not seen Lewis that night.

In addition to these discrepancies, the Government also presented testimony regarding another alibi given by Lewis. James Stokes, who did not testify at the first trial, stated that two

days after the fire, he and Sharese Williams confronted Lewis with rumors that Lewis started the fire. Lewis denied starting the fire, claiming that he "was at the fiend[1] house all night." DE 446, Trial Tr., Stokes, Page ID 11119. The district court concluded that it "was clearly not true" that Lewis was at Hightower's house all night. DE 523, Order, Page ID 16212.

A review of the record confirms the district court's conclusion that this was a close and difficult case. There was certainly evidence adduced at trial that called into question the credibility of the government's witnesses and which ran counter to the verdict. However, nearly all of the issues Lewis raises concern the credibility of the government's witnesses and evidence. Unlike the district court, we do not sit as a thirteenth juror and should not second-guess the trial court's credibility determinations. *See Solorio*, 337 F.3d at 589 n.6. Ultimately, the district court concluded, despite obvious credibility problems, the government's case was not so undermined as to cast severe doubt on the jury's verdict. In light of the district court's superior position to weigh evidence and evaluate credibility, we cannot say that it clearly abused its discretion in determining that the evidence adduced at Lewis's second trial did not preponderate heavily against the guilty verdict.

III.

Lewis next complains of prosecutorial misconduct based on an allegedly improper remark during closing argument.

The government's case against Lewis was premised on what it termed "eight pillars of evidence." DE 501, Trial Tr., Closing, Page ID 15498. The first of these pillars was Lewis's inconsistent statements to others about his whereabouts on the night of the fire. In explaining the first pillar of evidence to the jury during closing argument, the prosecutor began by focusing on

---

[1] Lewis testified that he called Hightower "fiend" because Hightower was addicted to crack. DE 472, Trial Tr., Lewis, Page ID 13101.

Lewis's statement to Special Agent Illig that he was at the "the Browns" housing project at the time of the fire. The prosecutor next referenced Lewis's "alibi number two:" his statement to James Stokes that he was at "the fiend's [Hightower] house the night of the fire." *Id.* at 15502. Then, the prosecutor said the following: "Alibi number three, if you remember, he was doing a robbery with Pancho. Sharese admitted telling the authorities that." *Id.* Lewis's counsel immediately objected to this comment and the court called a side-bar. Because Lewis objected to the allegedly improper remark at trial, we review his claim of prosecutorial misconduct *de novo*. *See United States v. Kuehne*, 547 F.3d 667, 687 (6th Cir. 2008).

To determine whether a prosecutor engaged in misconduct, this court employs a two-step inquiry. *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). First, the court determines whether the statement in question was improper. *Id.* If it was, the court next analyzes whether the statement was flagrant enough to warrant reversal. *Id.* To determine whether the remark was flagrant, this court considers four factors: "(1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused." *Id.* (citing *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999)). "We afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were 'otherwise fair.'" *Id.* at 376 (citation omitted).

At step one, it appears that the prosecutor's remark was improper. At the time the prosecutor made the comment, he had already reminded the jury of two other alibis given by

Lewis. This comment implies that either Lewis provided the alibi himself or that Sharese Williams provided the alibi on his behalf.

The government argues that the statement was not improper because the prosecutor explained that it was Williams who gave the alibi to investigators. But the confusion this statement caused is evident in the trial transcript. The defense objected and then the court called a side-bar, cautioning the prosecution "to clear that up, because it sounds like [Williams] was participating in giving an alibi, it sounds like she's cooperating." DE 501, Trial Tr., Closing, Page ID 15506. Additionally, the court saw the need to clarify to the jury that "what we're trying to do is just clarify that Miss Williams was talking about something that someone told her, that she wasn't giving him a false alibi herself." *Id.* at 15507, 15509.

Assuming the remark was improper, it was not flagrant enough to warrant reversal. First, the remark was isolated. Lewis does not point to any other instance during trial where the government attributed this alibi to Lewis or to Williams on Lewis's behalf. *See Henry*, 545 F.3d at 377.

Second, the court's and the prosecution's clarifications following the side-bar limited any tendency for the remark to confuse the jury or prejudice Lewis. After making the improper remark, the prosecution almost immediately explained that the robbery alibi was not attributable to Lewis but was something Williams told investigators. And after the sidebar, the prosecution read Williams's trial testimony to the jury: "I remember telling them that someone told me that Antun [Lewis] and Pancho – Pancho said that he was doing a robbery at that time." DE 501, Trial Tr., Closing, Page ID 15506–07. The district court clarified this testimony for the jury, noting that Williams was not aiding Lewis, but rather reporting a story she heard.

Third, any improper implications stemming from the prosecution's remark were accidental. Even before the defense objected, the prosecutor stated the alibi was a story Williams told investigators. This indicates that it was not the prosecutor's purpose to imply that Lewis had proffered an additional alibi.

Fourth and finally, while the strength of the government's case was not overwhelming, in light of the first three factors, the relative weakness of the government's case is not enough to warrant reversal.

IV.

Finally, Lewis contends that his federal prosecution under 18 U.S.C. § 844(i) for the arson of a single-family home intruded upon state criminal prerogatives and violated principles of federalism. The government contends that this panel must review for plain error because Lewis did not raise this argument before the district court. Lewis counters that the two decisions upon which he relies were both decided after he filed his post-conviction motion for a new trial, but he does not take a position on the appropriate standard of review. Ultimately, this question is academic because even under *de novo* review, Lewis's argument fails.

Section 844(i) provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

In *Russell v. United States*, the Supreme Court took up the question of whether § 844(i) applied to a two-unit apartment building used as a rental property. 471 U.S. 858 (1985). The Court noted that the "reference to 'any building . . . used . . . in any activity affecting interstate or foreign commerce' expresses an intent by Congress to exercise its full power under the Commerce

Clause." *Id.* at 859 (quoting § 844(i)). It then concluded that while perhaps not all private homes were covered, "the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties" and, thus, the defendant could properly be prosecuted for attempting to burn down his rental property. *Id.* at 862. Here, Medeia Carter, the adult victim of the house fire, was renting the property at 1220 E. 87th Street. Moreover, she was doing so with Section 8 funds. Lewis's prosecution under § 844(i) does not improperly impinge on state prerogatives nor does it violate traditional notions of federalism. The federal power to "regulate . . . the rental market for real estate includes the power to regulate individual activity within that class." *Id.*

Lewis counters that the Supreme Court's recent decision in *Bond v. United States*, 134 S. Ct. 2077 (2014), and our decision in *United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014), counsel a different reading of § 844(i).

In *Bond*, the Supreme Court analyzed whether 18 U.S.C. § 229(a)(1) of the Chemical Weapons Convention Implementation Act could be applied to a defendant's use of toxic chemicals to assault her spouse's mistress. 134 S. Ct. at 2083, 2085. The Court noted that applying § 229(a)(1) to a local assault would improbably expand the statutory implementation of "a treaty about chemical warfare and terrorism." *Id.* at 2090. The improbability of § 229(a)(1)'s reach ultimately convinced the Court that the statute was ambiguous and in resolving this ambiguity, it chose to refer to basic principles of federalism. *Id.* at 2090–91. The Court noted that "treat[ing] a local assault with a chemical irritant as the deployment of a chemical weapon" would "dramatically intrude[] upon traditional state criminal jurisdiction" and it ultimately reversed and remanded Bond's conviction. *Id.* at 2088, 2093 (second alteration in original) (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971)).

Following *Bond*, we applied similar reasoning to reverse a forced labor conviction under 18 U.S.C. § 1589. *Toviave*, 761 F.3d at 623–24. There, the defendant was convicted under § 1589 for forcing his young relatives to do household chores and for physically abusing them if they failed to do so. *Id.* In reversing Toviave's conviction, we held that courts should not "without a clear expression of Congressional intent—transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores, or makes child abuse a federal crime." *Id*. at 629.

These cases offer Lewis no help. Unlike the statutes in *Bond* and *Toviave*, § 844(i) is not ambiguous, nor is there anything improbable about the application of a federal statute to buildings currently used in interstate commerce. The Supreme Court in *Russell* squarely held that Congress intended to federalize the arson of buildings used in interstate commerce, that such an exercise of federal power was proper, and that residential rental properties have the requisite connection to interstate commerce to justify application of the statute to such crimes.[2] *See* 471 U.S. at 860–62. *Bond* did not overrule *Russell sub silentio*, and *Bond*'s reasoning does not upset or in any way diminish the teachings of *Russell*.

V.

For the foregoing reasons, the district court's judgment is affirmed.

---

[2] The Supreme Court, in *Jones v. United States*, vacated a conviction under § 844(i) where the defendant set fire to a private, owner-occupied home. 529 U.S. 848, 850–51 (2000). The Court noted that if §844(i) were applied to such properties "hardly a building in the land would fall outside the federal statute's domain." *Id.* at 857. The court, citing *Russell*, distinguished rental properties from private, owner-occupied buildings on the basis that the latter are not currently being used in any trade or business. *Id.* at 856.